442 F.2d 1109
 KERR-McGEE CHEMICAL CORPORATION, Plaintiff-Cross Defendant-Appellee,
v.
W. L. HARRIS, Defendant-Cross Plaintiff, Appellant.
KERR-McGEE CHEMICAL CORPORATION, Third Party Plaintiff-Appellee,
v.
DeKALB AGRESEARCH, INC., Third Party Defendant-Appellee.
 No. 29147.
 United States Court of Appeals, Fifth Circuit.
 January 29, 1971.
 Rehearing Denied March 5, 1971.
 
 Broadus A. Spivey, Jan Fouts, Key, Carr, Evans & Fouts, Lubbock, Tex., for W. L. Harris.
 Ralph Brock, Bobby J. Moody, Robert C. Wright, Brock, Wright, Waters & Galey, Lubbock, Tex., for Kerr-McGee Chemical Corp., appellee.
 Joe H. Nagy, Lubbock, Tex., for DeKalb Agresearch Inc.
 Before COLEMAN, AINSWORTH and GODBOLD, Circuit Judges.
 AINSWORTH, Circuit Judge:
 
 
 1
 In the period April 27 through July 27, 1966, plaintiff W. L. Harris purchased from Kerr-McGee Chemical Corporation seed, fertilizer, chemicals, and irrigation equipment in the total amount of $12,262.49.[1] He paid $700 on account, in seven $100 payments during the year 1967, leaving unpaid the sum of $11,562.49. Kerr-McGee filed suit on July 30, 1968 for this balance due on open account. Harris pleaded the Texas statute of limitations of two years from the date of delivery of each item,[2] which period had expired for all items when suit was filed. Harris also counterclaimed against plaintiff Kerr-McGee for $20,000 damages, said to represent losses by Harris as a result of alleged defects in cotton seed sold him by plaintiff. Kerr-McGee then amended its complaint to come within the provisions of the statute providing that limitation would run from the date of delivery of each item "unless otherwise specially contracted." The allegations averring such a "special contract" are set out in the margin.[3] It is obvious that at the time this suit was filed more than two years had elapsed from the date of delivery of the several articles of merchandise sold by plaintiff to defendant. However, if the merchandise was sold on credit terms on a "special contract" fixing the due date at January 15, 1967, Kerr-McGee's suit which was filed on July 30, 1968 is within the two-year period and limitation has not run against the claim.
 
 
 2
 The District Court, sitting without a jury, in detailed findings of fact and conclusions of law, held in Kerr-McGee's favor and entered judgment for the full balance of the account, $11,562.49, plus attorney fees of $2,000,[4] and rejected Harris' counterclaim for damages. Defendant Harris, on appeal, reiterated his contention that the whole account is barred by the Texas statute of limitation or, alternatively, that all of the account except that represented by the chemicals is barred, and that in no event should attorney's fees be awarded. Harris sought no review of his cross-action for damages. We affirm. In his findings of fact the Trial Judge held, in pertinent part:
 
 
 3
 "3. On or about the time of the first purchase shown in Plaintiff's Exhibit 4, the sales representative of Plaintiff offered Defendant credit for his purchases known as `Harvest Terms'. Defendant understood the credit provisions known as `Harvest Terms' and bought the goods in question with the understanding that he would pay for all goods he purchased on `Harvest Terms.' Subsequently on June 17, 1966, Plaintiff Kerr-McGee accepted Defendant Harris' application for credit on `Harvest Terms' (Plaintiff's Exhibit No. 3.)
 
 
 4
 "4. `Harvest Term' credit required that goods be paid for as follows, with the option in the buyer as to which method of payment he would use:
 
 
 5
 (a) 3% discount if paid within 30 days;
 
 
 6
 (b) Net amount due if paid in 90 days;
 
 
 7
 (c) A service charge of ¾-1% if paid after 90 days.
 
 
 8
 "5. The transactions between Defendant Harris and Plaintiff Kerr-McGee constituted an agreement between said parties that Plaintiff would sell such goods to Defendant at the prices shown on Exhibit 4, and that Defendant would pay for same under credit provisions known as `Harvest Terms.' The parties specially contracted that the due date of the account would be January 15, 1967. (Defendant Harris' depositions p. 11, 12, 13, 20, 21).
 
 
 9
 "6. The date that Defendant agreed to pay for such goods was January 15, 1967, under these credit terms.
 
 
 10
 "7. The `date due' shown on each item of Exhibit No. 4 — the invoices of sale — were the respective dates payments were due if the buyer elected to take the 3% discount under `Harvest Terms.' These invoices were mere sales slips or a memorandum of sale and delivery made for the convenience of the parties and not a written contract."
 
 
 11
 The District Court, therefore, concluded that defendant Harris and plaintiff Kerr-McGee had entered into a mutually binding oral contract and that the parties had specially contracted that the due date of the account in question was to be January 15, 1967 (citing Art. 5526, Rev.Civ.Stat. of Texas); accordingly, that plaintiff's cause of action was not barred by the Texas statute of limitations. It was held in Gourley v. Iverson Tool Co., Tex.Civ.App., 186 S.W.2d 726, 733 (ref'd w. m. 1945), that an oral agreement is sufficient, and we find no Texas case which requires a writing for a "special contract" to prevent the running of the statute of limitation.
 
 
 12
 This case involves considerable conflict in testimony and is one best resolved by the Trial Judge, since credibility choices between the witnesses must be made. The trier of fact who has had an opportunity to hear and observe the witnesses is in the best position to determine where the truth lies. Here the critical question is whether there was a special contract for credit terms for the merchandise sold between Harris and the farm supplier, Kerr-McGee. When Harris determined he wanted to purchase his requirements of seed, fertilizer, and chemicals for his 1966 crop he began by talking with Davis, Kerr-McGee's store manager at Levelland, Texas. A credit information form was filled in by Davis and signed by Harris. Under the printed portion of the credit information form "Approximate Fertilizer Purchased Annually," the following was filled in:
 
 
 13
 "Fert. 5000.00
 Weed Kill 5000.00
 Seed 5000.00
 Jan. 15th"
 
 
 14
 Another Kerr-McGee form, a credit application for Harris, was filled in by Davis and showed "Estimated Annual Purchases $15,000-20,000," and the recommended credit line was "20,000." The credit application stated "Will pay cash for fertilizer-chemical fall terms (¾-1% after 90 days." At the lower right corner of the credit application the following information appears: "Regular Terms 3%/30 net 90 Harvest Terms-Date Due 1-15-67." A Kerr-McGee credit authorization dated June 17, 1966 for Harris as customer authorized "Fall Time Limit $20,000 Harvest Term," as approved by B. C. Miller, plaintiff's Regional Credit Manager.
 
 
 15
 Davis, who was plaintiff's employee at the time, testified that Kerr-McGee had offered credit or harvest terms to the farmers in the county in which Harris' farm was situated of 3% cash discount, net 90 days, with a service charge for crop terms and that he had secured his company's approval of a $20,000 line of credit which he had recommended for Harris for the 1966 crop year. Davis said that in accordance with company procedures he secured a credit information application from Harris, and after discussion of credit terms which he said Harris desired then filled out a credit application; that the credit application was submitted for approval for the 1966 crop year and approved in the amount requested. However, apparently in conflict with this testimony he said that when he filled out Harris' application for credit Harris had indicated he would pay cash for fertilizer. B. C. Miller, plaintiff's Credit Manager at Oklahoma City, testified the $20,000 credit which he authorized on harvest terms for Harris covered "anything he would buy," subject to the 30-day 3% discount, net 90 days, if the customer should elect to pay cash, though not obliged to do so; that these were the credit terms offered to the farmers in that area. He pointed to the right-hand corner of the credit application which specified "1-15-67" as the due date for payment of the merchandise and he said that harvest terms afforded Harris "meant that he was allowed until January 15, '67 to pay his bill before we would bother him for it." He said that his company had made no effort or overt act to collect any part of the Harris account prior to January 15, 1967. He said that credit terms covered the whole account or, as he termed it, "It covers everything that he purchased." He did not talk to Harris personally. However, in apparent conflict with this testimony he said that his understanding of Harris' application was that he was to pay cash for fertilizer when he received it.
 
 
 16
 Harris testified by deposition in at least four different answers that the merchandise was purchased from Kerr-McGee on harvest terms to be paid for in January 1967. The Trial Judge took special note of this testimony in his findings of fact to which we have already referred. At the trial, however, Harris denied (though with conflicting statements) that he had made arrangements with Davis or anyone at Kerr-McGee for fall or harvest terms for the payment of his account. This led the Trial Judge to warn Harris' counsel about leading his client into "a perjury situation."[5] The circumstances strongly warrant the inference that all merchandise was sold on credit or harvest terms and the Trial Judge thought so, as is indicated by his colloquy with counsel to the effect that when Harris accepted delivery for the Kerr-McGee merchandise without paying for it at the time of delivery it was sold on credit.[6] The District Judge finally concluded the trial with the witness Harris on the stand, saying to counsel for Kerr-McGee, "Let me tell you, you don't need to go any further."[7]
 
 
 17
 If we are to reverse and set aside the Trial Judge's findings of fact in this case they must be clearly erroneous (Fed.R. Civ.P., Rule 52(a)), and we must be left with a definite and firm conviction that a mistake has been committed. McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954); Pennington v. Colonial Pipeline Company, 5 Cir., 1968, 387 F.2d 903, 905. "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo. The authority of an appellate court, when reviewing the findings of a judge as well as those of a jury, is circumscribed by the deference it must give to decisions of the trier of the fact, who is usually in a superior position to appraise and weigh the evidence. The question for the appellate court under Rule 52(a) is not whether it would have made the findings the trial court did, but whether `on the entire evidence [it] is left with the definite and firm conviction that a mistake has been committed.'" Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969). This Court has said that "Much considered and wise discretion must be accorded to a district judge as he deals with the infinite variables of evidence." Travelers Insurance Company v. Dykes, 5 Cir., 1968, 395 F.2d 747, 749. In an earlier case we said, "If there is anything settled in controlling appellate procedure, it is that the Court of Appeals does not sit in a case of this kind to try de novo a case which has been tried below by the court without a jury." A. F. Pylant, Inc. v. Republic Creosoting Company, 5 Cir., 1961, 285 F.2d 840, 842.
 
 
 18
 As to the peculiar right of the Trial Judge to make credibility choices, we said in Chaney v. City of Galveston, 5 Cir., 1966, 368 F.2d 774, 776, that the burden of upsetting findings is indeed formidable "since the witnesses were all heard and seen by the Judge in open court and the crucial issues of motive and purpose involved credibility choices of the most elemental nature," citing Smith v. United States, 5 Cir., 1961, 287 F.2d 299. See also Star Towing Co. v. Harvester Supply Co., 5 Cir., 1970, 421 F.2d 628, 629. And we also said in Chaney, supra, 368 F.2d at 776, "Where the evidence would support a conclusion either way, a choice by the trial judge between two permissible views of the weight of evidence is not clearly erroneous, and the fact that the judge totally rejected an opposed view impeaches neither his impartiality nor the propriety of his conclusions." Credibility determinations are, therefore, for the Trial Judge.
 
 
 19
 Applying these well-recognized principles of law to the present case, it is seen that the Trial Judge undoubtedly tested the credibility of the witnesses, and rejected Harris' testimony that he had not purchased all of the merchandise on harvest terms, in favor of Harris' prior sworn deposition that he had.
 
 
 20
 The circumstances of the case likewise support the District Court's decision. This is evidenced by consideration of the circumstances which surrounded the giving of credit information by Harris, and the credit application filed by Davis pursuant to Harris' request to secure $20,000 of harvest term credit, as well as by the fact that Kerr-McGee did not attempt to collect any part of the account prior to January 15, 1967, and did not require cash payment from Harris upon taking delivery of merchandise. The award of attorney's fees is supported by the record and should not be disturbed.
 
 
 21
 In our view this case was properly decided by the Trial Judge and his findings should not be set aside as clearly erroneous since to the contrary they are correct.
 
 
 22
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 According to a summary of account, the merchandise purchased was as follows:
 Cotton seed $4,300.00
Grain seed 1,582.00
Fertilizer 3,972.90
Chemicals 2,244.00
Irrigation
 Equipment 157.59
"Anser" 6.00
 __________
Total Purchases $12,262.49
 
 
 [2]
 Tex.Rev.Civ.Stat.Ann. Art. 5526 (1958)
 "There shall be commenced and prosecuted within two years after the cause of action shall have accrued, and not afterward, all actions or suits in court of the following description:
 * * * * *
 "Actions upon * * * open accounts * * *. In all accounts * * * the respective times or dates of the delivery of the several articles charged shall be particularly specified, and limitation shall run against each item from the date of such delivery, unless otherwise specially contracted."
 
 
 [3]
 "That pursuant to such understanding and agreement, and upon credit application made by Defendant, Plaintiff approved a $20,000 line of credit on its `Harvest Terms' to enable Defendant to purchase his farm supplies as he needed them during the 1966 crop year and pay for them at the completion of harvest, sell and collection of money for said crops, or on date of January 15, 1967, whichever occurred first. That Plaintiff, under its `Harvest Terms' credit policy gave Defendant an option to pay cash for certain items at a cash discount, but if he elected not to take advantage of the cash discount price, the entire account would become due and payable at the end of harvest as aforesaid or on January 15, 1967, whichever occurred first. That Defendant harvested and sold his 1966 crops, and collected for the sale of same during the normal harvest season in Hockley County, from October 1 through December 31, but he failed to pay said account, and he still failed to pay said account on January 15, 1967, and continues to fail and refuse to pay said account to Plaintiff's damage."
 
 
 [4]
 Under Tex.Rev.Civ.Stat.Ann. Art. 2226 (1964)
 
 
 [5]
 The pertinent testimony follows:
 "THE COURT:
 Counselor, let's don't get your client here into a perjury situation. He is hard of hearing and I want to caution you. We've got this deposition that says pretty positive about that.
 "MR. SPIVEY:
 Yes, sir.
 "THE COURT:
 He can't hear, and I want to protect him on it, so you be careful when you ask him those questions.
 "MR. SPIVEY:
 I want to show —
 "THE COURT:
 If you want to distinguish it, that is fine, but I don't want this man to be misled because he can't hear your question."
 
 
 [6]
 As the Trial Judge observed:
 "THE COURT:
 It couldn't be any other way except on credit. Isn't that — you agree that you bought it on credit? You didn't pay for it, did you?
 "BY THE WITNESS:
 A That's right.
 "THE COURT:
 You are not claiming that?
 "BY THE WITNESS:
 A That's right.
 "THE COURT:
 It was on credit."
 
 
 [7]
 Immediately after the Trial Judge's remark, however, Harris volunteered the following:
 "BY THE WITNESS:
 A Let me add this. We went in there in all good faith with what we felt was a reliable company to buy a good product. And after that cotton was in the middle of the summer, and like bankers operate, and farmers operate, if I hadn't of found that bindweed in there, if that cotton had been normal, Kerr-McGee would have had their money and there wouldn't have been a word said."
 
 
 
 23
 GODBOLD, Circuit Judge (concurring in part and dissenting in part):
 
 
 24
 I must dissent in part.
 
 
 25
 "It was the duty of the trial court to reconcile the testimony of all the witnesses, if possible, without imputing perjury to any of them." Williams v. Cambridge Mutual Fire Ins. Co., 230 F.2d 293, 296 (5th Cir. 1956). Once that is done in this case what becomes clear is that fertilizer and irrigation equipment were not within the "special contract" for items sold on open account, so that as to them the statute of limitations had expired. This result squares with the evidence as a whole, with common sense and with business practice. Most important of all, it squares with the testimony of the Kerr-McGee employees who handled all the credit arrangements made by Harris.
 
 
 26
 The evidence supports — just barely — a conclusion that a "special contract" was made relating to Harris' open account with Kerr-McGee, within the meaning of the "special contract" provision of Art. 5526, Rev.Civ.Stat.Ann. of Texas.[1] But considering and reconciling all the evidence, it is plain to me — as it was to the two Kerr-McGee employees who dealt with the Harris purchases and testified in this case — that only some of the items to be purchased were to be charged to the open account, while fertilizer and irrigation equipment were to be for cash, which was described as payment within 30 days. Most of the cash items were not timely paid, but this is not to say that as a consequence they became the subject matter of the special contract for credit.
 
 
 27
 In the spring of 1966 Harris arranged with Davis, the manager of the local Kerr-McGee store, to purchase goods and supplies for his 1966 cotton crop. Previously Harris had purchased merchandise from Kerr-McGee under many different arrangements. The two men talked about credit. Davis filled out an information form on Harris, containing information required of any customer establishing credit, headed "Credit Information — Plant Food Operations." He obtained from Harris at least some of the information. Davis testified of this form that it had nothing to do with the terms of credit to be arranged but was information on which a credit search could be based. In short, it was a source of information and not an application. Harris signed the form. In the space headed "Approximate Fertilizer Purchased Annually" appear the notations: "Fert. 5,000.00 Weed Killer 5000.00 Seed 5000 Jan. 15th." There was no testimony by Davis, who made these entries, explaining what they meant. We do not know whether they refer to estimates of past purchases or future purchases, or whether they were Harris' application for credit for merchandise shown and in the amounts shown or references to past credit. The trial court recognized the ambiguity.
 
 
 28
 Harris' connection with payment arrangements terminated at this point. Subsequent actions were intra-company dealings of Kerr-McGee. But they make clear that fertilizer was excluded from the credit arrangement. At or near the same time that he filled out the information form Davis completed and executed Kerr-McGee's "Credit Application" form, which, by its own terms, is completed and executed not by the potential buyer but by Kerr-McGee's employee. The information on this form was that which Davis, as store manager, would submit to the Kerr-McGee credit department for approval of credit to be extended the customer by Kerr-McGee for the year. Much of the data came from the information sheet Harris had signed. Davis estimated the annual purchases at $15,000-$20,000 and recommended a credit line of $20,000. Under the heading "Additional Information and Remarks on local Fertilizer Credit Practices," Davis made this entry: "Will pay cash for fertilizer — chemical fall term (¾-1% after 90 days)." (Emphasis added.)
 
 
 29
 The testimony of all Kerr-McGee employees as to fertilizer is precisely consistent with what Davis wrote on the application. Davis testified that he (Davis) "made different and separate arrangements [with Harris] on the fertilizer." He stated that when he (Davis) sent the credit application form in he was putting down that Harris wanted credit but would pay cash for fertilizer. The credit application went to the regional credit office of Kerr-McGee in Oklahoma City where it was handled by Miller, the credit supervisor. Miller testified that he approved credit of $20,000 for Harris on terms of 3% thirty days, net 90, with a service charge thereafter, final due date January 15, 1967, on the basis of the information in the application. Miller acknowledged that his understanding of the application was that Harris would pay cash for fertilizer when he received it and that this was the agreement which Davis had with Harris. Yet Miller testified that when he approved the application he was approving it for anything that Harris would buy. This is no conflict in his testimony, rather a recognition that he approved a credit arrangement broader in scope than that applied for. Miller's subjective and wholly unilateral departure from what had been agreed upon between Davis and Harris and what was applied for on the application, made in a Kerr-McGee office hundreds of miles away, was not shown to have been communicated to Harris. It was not until June 17, after seventeen of the total of twenty-two purchases had been made (in amount, more than $10,000) that Kerr-McGee mailed to the Levelland store its form authorization approving a $20,000 line of credit under "harvest terms" without differentiating as to types of goods to which it applied. There is no evidence or contention that Harris ever saw this form or had any knowledge of it. This untimely and unilateral action by the Kerr-McGee credit office could not bring within the credit arrangements merchandise agreed to be paid for in cash and thereby subject it to the special contract made for credit sales.
 
 
 30
 Also Miller and Harris agree that irrigation equipment was to be paid for in cash and not covered by credit terms. Harris paid cash for some purchases of irrigation equipment, and they were not picked up in the account. But his other purchases of irrigation equipment have been added into the account and included in the judgment given by the District Court and affirmed by the majority.
 
 
 31
 Harris and Kerr-McGee could have entered into an agreement that cash items, if not promptly paid, would become credit items and thereby subject to the special contract. But this is not what the evidence showed. In fact, Miller's candid explanation is 180 degrees to the contrary.
 
 
 32
 Harris — hard of hearing and inarticulate — was vague, wandering and inconsistent about the terms that were agreed on for his purchases for which payment was to be deferred until the end of the season. Davis and Miller were candid in acknowledging that an application for credit of limited scope was unilaterally treated as plenary. The penalty to Harris, and the bonus to Kerr-McGee, is a judgment for $4,130.49 for items sold for cash, not paid for, and sued on after the statute of limitations had run. This may discourage inconsistency and reward candor, but not in an authorized manner.
 
 
 
 Notes:
 
 
 [1]
 Art. 5526 provides:
 "There shall be commenced and prosecuted within two years after the cause of action shall have accrued, and not afterward, all actions or suits in court of the following description:
 * * * * *
 "Actions upon * * * open accounts * * *. In all accounts * * * the respective times or dates of the delivery of the several articles charged shall be particularly specified, and limitation shall run against each item from the date of such delivery, unless otherwise specially contracted."
 However, the conclusion of a "special contract" strains considerably the plainly articulated Texas policy that the two-year statute on open account is not to be "frittered away," Smyth v. Walton, 5 Tex.Civ.App. 673, 24 S.W. 1084 (1893). See also Roberts v. Vernon Mud Company, 324 S.W.2d 237 (Tex.Civ.App. 1959), holding that local custom or usage, if not wholly pointless, cannot be treated as part of the "special contract" unless pleaded and supported by proof that the defendant had knowledge of it and agreed to it.