UNITED STATES of America, Plaintiff-Appellee/Cross-Appellant,

v.

Liudas KAIRYS, Defendant-Appellant/Cross-Appellee.

Nos. 85–1314, 85–1397.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 13, 1985.

Decided Jan. 27, 1986.

Fred H. Bartlit, Jr., Kirkland & Ellis, Chicago, Ill., for defendant-appellant/cross-appellee.

Michael Wolf, Office of Special Investigations, Washington, D.C., for plaintiff-appellee/cross-appellant.

Before CUMMINGS, Chief Judge, BAUER and FLAUM, Circuit Judges.

CUMMINGS, Chief Judge.

The defendant, Liudas Kairys, appeals an order of the United States District Court for the Northern District of Illinois revoking his citizenship pursuant to 8 U.S.C. § 1451(a). *United States v. Kairys,* 600 F.Supp. 1254 (1984). Section 1451(a) allows for revocation of citizenship that was "illegally procured"[1] or "procured by concealment of a material fact or by willful misrepresentation."[2] We affirm.

Statement of the Case and Facts

Denaturalization proceedings were commenced against Kairys on August 13, 1980, by the United States Justice Depart-

---

1. Naturalization is illegally procured if any statutory requirement is not met at the time naturalization is granted. *Fedorenko v. United States,* 449 U.S. 490, 506, 101 S.Ct. 737, 747, 66 L.Ed.2d 686 (1981); H.R.Rep. No. 1086, 87th Cong., 1st Sess. (1961), *reprinted in* 1961 U.S. Code Cong. & Admin.News 2950, 2983. An applicant must enter the United States pursuant to a valid visa to obtain citizenship. An applicant ineligible under the immigration laws cannot obtain a valid visa. 8 U.S.C. §§ 1427(a), 1429.

2. In pertinent part, 8 U.S.C. § 1451(a), as amended in 1961, provides:

It shall be the duty of the United States Attorneys ... to institute proceedings ... in the judicial district in which the naturalized citizen may reside at the time of suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation....

ment. The government brought three pertinent counts against him under § 340(a) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1451(a) (as amended in 1961). Count I charged willful misrepresentation or concealment of a material fact in defendant's petition for naturalization; Count II charged illegal procurement of naturalization because defendant's service as a Nazi camp guard made him ineligible for a visa; and Count III charged illegal procurement of citizenship due to willful misrepresentations in obtaining his visa. The district court entered an order under Count II revoking Kairys' citizenship[3] and dismissed the remaining four counts. Kairys appealed and the government cross-appealed on the dismissal of Counts I and III.

The main issue at trial was the defendant's identity—was Kairys the person the government claimed him to be?[4] The defendant contends that he is Liudas Kairys born in Kuanas, Lithuania, on December 20, 1924. As a child he moved to Svilionys, Lithuania, where he completed four years of grammar school. His schooling continued in Svencionys, Lithuania, and he then completed three years of secondary education in Vilnius, Lithuania. Defendant asserts that between 1940 and 1942 he

worked on a farm in Radviliskis, Lithuania, and that in 1942 he was captured and sent to the Hammerstein prisoner of war (POW) camp.[5] The defendant claims he was a forced laborer in various locations throughout Lithuania and Poland for the remainder of the war.

The government, on the other hand, maintains that the defendant is Liudvikas Kairys born in Svilionys, then Polish, on December 24, 1920. He joined the Lithuanian army, which merged with the Russian army in 1939. The government contends that some time before March of 1940 Kairys moved to Vilnius, Lithuania, and obtained Lithuanian citizenship.[6] During the German invasion of Poland, Kairys was captured and placed in the Hammerstein POW camp. In June of 1942 he was recruited by the Nazis and sent to training camp at Trawniki, Poland. In March of 1943 Kairys was transferred to the Treblinka labor camp in Poland to serve as a Nazi camp guard, where he remained until the camp was closed in July 1944 when the Russians advanced into Poland. At some point during his service he was promoted to *Oberwachmann* of his Nazi guard unit.

■ The defendant argues that to be ineligible for a visa under the DPA, the

---

**3.** The Displaced Persons Act of 1948 (DPA), Pub.L. No. 80–774, § 2, 62 Stat. 1009, *amended by* Pub.L. No. 81–555, 64 Stat. 219 which authorized Kairys and other European refugees to emigrate to the United States, specifically excluded individuals who had "assisted the enemy in persecuting civil[ians]." In *Fedorenko*, the Supreme Court held as a matter of law that service as a Nazi concentration camp guard equaled persecution of civilians for purposes of the DPA without proof of personal involvement in atrocities (449 U.S. at 512–13 n. 34, 101 S.Ct. at 750 n. 34), and the outcome here must be the same because service in a Nazi labor camp was similar to service in a Nazi concentration camp. This case does not present "difficult line-drawing problems" (*id.*), for, as in the *Fedorenko* camps, labor camp guards were issued uniforms, armed with guns, paid a stipend, and allowed to leave camp on furlough (*id.*). Once a court finds that Kairys was a Nazi labor camp guard, it follows that his subsequent naturalization was illegally procured, see *Fedorenko*, 449 U.S. at 512–15, 101 S.Ct. at 750–52. Thus, by virtue of his service at the Treblinka labor camp, Kairys failed to obtain a valid visa, which

is a statutory prerequisite to naturalization, 8 U.S.C. §§ 1427(a), 1429.

**4.** Because this case involves the identity of an individual before and during World War II, the significance of some facts depends on the history of that era. The district court's opinion has provided a clear and thorough historical basis for the facts of this case (see 600 F.Supp. at 1256–58), so that we do not need to repeat it here.

**5.** The defendant was captured when the Germans invaded Poland. The Germans also took control of those parts of Lithuania under Polish sovereignty.

**6.** The necessity of Kairys' obtaining Lithuanian citizenship relates to the dispute over his birthplace. If Kairys was born in Kuanas, he would have been a Lithuanian citizen by birth. If, however, he was born in Svilionys, his 1920 birth would not be sufficient for citizenship because Svilionys was under Polish sovereignty at that time.

government must show personal involvement in atrocities. However, the Supreme Court resolved that issue in *Fedorenko*, holding that disclosure of service as an armed camp guard results in ineligibility as a matter of law without a showing of individual involvement in persecutions. 449 U.S. at 510 n. 32, 512, 513, 101 S.Ct. at 749 n. 32, 750; see also *United States v. Kairys*, 600 F.Supp. at 1265 and n. 5. Because we find nothing significant to distinguish armed guard service at a labor camp from such service at a concentration camp, there is no need to show that Kairys was personally involved in persecution.

Although the Supreme Court notes that Fedorenko had testified to shooting in the direction of escaping prisoners, 449 U.S. at 512 n. 34, 101 S.Ct. at 750 n. 34, this was to distinguish Fedorenko's position as a camp guard from those concentration camp *survivors* who were forced to perform tasks within the camp. Thus in cases not involving armed guards such as defendant, a showing of personal involvement in persecutions may be necessary. Nonetheless, *Fedorenko* continues to stand for the proposition that service as an armed guard equals persecution.

Both parties are in agreement as to what transpired after the war. Kairys worked as a farm laborer in Wiesent, Germany. In 1947 he entered the United States Army Labor Service Corps. Kairys applied for a visa in April of 1949, which was granted shortly thereafter. In May of 1949 he ar-rived in Chicago where he has since resided. In 1957 Kairys applied for naturalization, the petition was approved and the district court granted him citizenship later that year. From 1951 to the present Kairys has held one job in Chicago, has married and has two daughters. He is active in community and Lithuanian community affairs.

Kairys raises several issues on appeal. First, he contends there is insufficient evidence in the record to uphold the district court's finding that he was a Nazi labor camp guard at Treblinka. Second, Kairys raises various issues concerning the retroactive application of a 1961 amendment to the Immigration and Nationality Act. Third, he contends that the illegal procurement standard of § 1451(a) violates equal protection. Fourth, he argues that laches should bar the government's action. Finally, he claims he has the right to a jury trial.[7]

## I. SUFFICIENCY OF THE EVIDENCE

The government's burden of proof in a denaturalization case is heavy. The government must prove its case by "clear, convincing, and unequivocal" evidence and not "leave the issue in doubt."[8] *Fedorenko v. United States*, 449 U.S. 490, 505, 101 S.Ct. 737, 747, 66 L.Ed.2d 686 (1981) (quoting *Schneiderman v. United States*, 320 U.S. 118, 125, 63 S.Ct. 1333, 1336, 87 L.Ed. 1796 (1943)); *Costello v. United States*, 365

7. Kairys raises one further issue in his brief, *viz.*, that the cooperation between the United States government and the Soviet Union denied him access to documents and witnesses, violating his right to due process. We see no merit in this contention. There is simply nothing in the record to support the claim of a due process violation. Although there may be some situations where involvement of the Soviet Union should result in close examination of the discovery proceedings, see, *e.g.*, *United States v. Kowalchuk*, 773 F.2d 488, 493–94 (3d Cir.1985) (Aldisert, J., dissenting), that situation is not before this Court.

8. The phrasing of the standard is somewhat confusing. At oral argument counsel for the defendant implied that this test could be higher than the criminal "beyond a reasonable doubt" standard. On its face, the standard seems to imply that the issue should be doubt-free before finding for the government, whereas the criminal standard allows a reasonable doubt. It is clear that the Supreme Court intended a strict standard, see *Schneiderman*, 320 U.S. at 125, 63 S.Ct. at 1336, but not to the extent that it would surpass the criminal standard. The Court in *Schneiderman* simply articulated the standard as the clear, convincing, and unequivocal rather than the "mere preponderance" standard. *Id.* 320 U.S. at 125, 63 S.Ct. at 1336 (quoting *Maxwell Land-Grant Case*, 121 U.S. 325, 381, 7 S.Ct. 1015, 1029, 30 L.Ed.2d 949 (1887)). Thus we hold the evidence justifying revocation must be clear, convincing, and unequivocal. *United States v. Kowalchuk*, 773 F.2d 488, 493 (3d Cir. 1985).

U.S. 265, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961); *Chaunt v. United States*, 364 U.S. 350, 81 S.Ct. 147, 5 L.Ed.2d 120 (1960). Our review of the district court's findings is conducted under the clearly erroneous standard of Fed.R.Civ.P. 52(a). *United States v. Koziy*, 728 F.2d 1314, 1318–1319 (11th Cir.1984), certiorari denied, —— U.S. ——, 105 S.Ct. 130, 83 L.Ed.2d 70 (1984); *United States v. Demjanjuk*, 680 F.2d 32, 33 (6th Cir.1982), certiorari denied, 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982); Here the district court found from the evidence presented that "beyond any reasonable doubt ... the defendant is Liudvikas Kairys, born in Svilionys [then Polish] on December 24, 1920, who later became a resident of Vilnius, a Lithuanian citizen and ultimately an *Oberwachmann* at Treblinka labor camp" and thus his citizenship was illegally procured. 600 F.Supp. at 1262. We hold that the court's factual findings are not clearly erroneous.

· Kairys' argument focuses on the accuracy and admissibility of a *Personalbogen*, which is a German Waffen Schutzstaffel (SS) identity card. The government relied in part on the *Personalbogen* to establish its version of the defendant's identity. The district court admitted the *Personalbogen* under Federal Rule of Evidence 901(b)(8). The defendant argues that the admission of the document was error, claiming that it is a forgery fraught with inaccuracies, erasures, inconsistencies, and unexplained problems. The government counters that the defendant failed to produce any substantive evidence that the document was anything other than what it was purported to be—the defendant's Nazi SS personnel card.

A. *Admissibility*

Federal Rule of Evidence 901(b)(8) governs the admissibility of ancient documents. The Rule states that a document is admissible if it "(A) is in such condition as to create no suspicion concerning its authenticity, (B) was in a place where it, if authentic, would likely be, and (C) has been in existence 20 years or more at the time it

is offered." The question of whether evidence is suspicious and therefore inadmissible is a matter of the trial court's discretion. *United States v. Bridges*, 499 F.2d 179 (7th Cir.1974), certiorari denied, 419 U.S. 1010, 95 S.Ct. 330, 42 L.Ed.2d 284 (1974). We see no error here.

■ Although the Rule requires that the document be free of suspicion, that suspicion goes not to the content of the document, but rather to whether the document is what it purports to be. As Rule 901(a) states: "The requirement of authentication ... as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." In other words, the issue of admissibility is whether the document is a *Personalbogen* from the German SS records located in the Soviet Union archives and is over 20 years old. Whether the contents of the document correctly identify the defendant goes to its weight and is a matter for the trier of fact; it is not relevant to the threshold determination of its admissibility. *Koziy*, 728 F.2d at 1322.

■ The defendant does argue that a question was raised about whether the document was actually an original *Personalbogen*. First, the defendant raises general allegations that the Soviet Union routinely disseminates forged documents as part of propaganda campaigns. Next the defendant contends that the thumbprint ink was "unusual" and that it could have been placed on the document by mechanical means. But government witnesses testified that the only likely way for the print to appear on the *Personalbogen* was from the defendant's pressing his thumb to the paper. Additionally, the defendant notes that the government failed to establish the proper chain of custody from Treblinka to the Soviet archives. However, it is not necessary to show a chain of custody for ancient documents. Rule 901(b)(8) merely requires that the document be found in a place where, if authentic, it would likely be. All that is left, then, is the vague allegation that the Soviet Union regularly releases

forged documents. That is not sufficient to make the document suspicious for purposes of admissibility.

██ There was sufficient evidence in the record that the document was a German SS *Personalbogen.* It matched other authenticated *Personalbogens* in form, 600 F.Supp. at 1261; it was found in the Soviet Union archives, the depository for German SS documents, *id.;* and its paper fiber was consistent with that of documents more than 20 years old, *id.* at 1260. Its admission was not error.

### B. *Sufficiency of Evidence*

The defendant points to numerous supposed problems with respect to the evidence presented by the government. First, he claims that the *Personalbogen* is inaccurate and inconsistent and therefore unreliable. For example, he notes that the document misstates his hair and eye color as dark blond and grey, respectively, when he claims they are black and blue, respectively.[9] The defendant also claims that other personnel records are inaccurate or of questionable reliability; for example, he notes that the promotion documentation is back-dated and therefore unreliable. The defendant further argues that the absence of certain testimony reflects the weakness of the government's case, for example, the absence of eyewitness survivors to identify Kairys as a camp guard. Finally, the defendant points to his introduction of a temporary identity card that places him in Radviliskus and other Lithuanian cities (rather than Trawniki and Treblinka in Poland) during the war period.

██ Despite Kairys' protests, the record supports the district court's findings.[10] There is sufficient testimony and other evidence for the trial court to have found that the *Personalbogen* correctly identified the defendant as a Nazi labor camp guard at Treblinka. The district court relied primarily on the fact that defendant's thumbprint appears on the identity card, supported by expert testimony that the signature on the card was the defendant's. 600 F.Supp. at 1262. In addition, other camp guards placed a Kairys at Treblinka, some of whom identified the defendant's picture. A witness testified that he observed Kairys in a German SS uniform in late 1943 or early 1944. Promotion and other personnel records indicate that a Kairys trained at Trawniki, was transferred to Treblinka, and was promoted to *Oberwachmann.* Finally, personal records, such as a baptismal certificate and a newspaper citizenship notice, fix the defendant's birth date as December 24, 1920, and birthplace as Svilionys (then under Polish sovereignty), rather than December 20, 1924, in Kuanas, Lithuania. These were all credibility determinations for the trier of fact to make. We cannot say that the district court was clearly erroneous in deciding the facts as it did.

## II. THE 1961 AMENDMENT

### A. *Retroactivity*

The defendant raises the general issue of whether the 1961 amendment, which re-added the "illegal procurement" standard for denaturalization to 8 U.S.C. § 1451(a) (see note 12 *infra* ), should apply to him since his 1957 grant of citizenship was prior to that amendment. Defendant makes two arguments: first, retroactive application of the 1961 amendment violates general rules of statutory construction; and second, retroactive application of the illegal procurement standard violates the *ex post facto* clause of the Constitution.

---

**9.** Although the defendant now claims his hair to be black, several documents in the record filled out by Kairys himself describe his hair color as brown. The discrepancy between dark blond and brown is quite a bit smaller than between dark blond and black.

**10.** It is important to note that most of the defendant's major factual contentions fail when presented with the record. For instance, in his

brief Kairys notes that the *Personalbogen* indicates that the holder of the card has a scar on his left hip, but claims that a doctor testified that the defendant has no scar on his hip. What defendant fails to disclose is that the doctor did testify that Kairys has a scar about one inch above the left hip, an area that a layperson could describe as "hip." See also *supra* note 9.

## 1. *Statutory Construction*

Kairys argues strongly that retroactive application of the illegal procurement standard violates statutory construction principles. Legislative enactments are presumed to be prospective absent clear statements by Congress to the contrary. See *United States Fidelity and Guaranty Co. v. United States*, 209 U.S. 306, 314, 28 S.Ct. 537, 539, 52 L.Ed. 804 (1908); *South East Chicago Cm. v. Department of Housing & Urban Development*, 488 F.2d 1119 (7th Cir.1973). The district court ruled that the statute was remedial and thus was not being applied retroactively, 600 F.Supp. at 1268. Although we disagree with the district court's categorization of the amendment as merely remedial, we affirm on the basis that sufficient evidence of congressional intent exists to apply the amendment to pre-1961 naturalizations.

In order for a statute to be considered remedial it must be one that neither enlarges nor impairs substantive rights but relates to the means and procedures for enforcement of those rights. *Bagsarian v. Parker Metal Co.*, 282 F.Supp. 766 (N.D. Oh.1968). In *French v. Grove Mfg. Co.*, 656 F.2d 295 (8th Cir.1981), a products liability act was held to be remedial because it created no new causes of action or substantive rights or liabilities. Similarly, in *Czubala v. Heckler*, 574 F.Supp. 890, 897 (D.C. Ind.1983), a statute that outlined procedures for remand due to new and substantial evidence was held remedial. But a New York statute that created a private cause of action for unfair and deceptive practices was held not remedial because it created an entirely new right of action and greatly expanded liability, changing the rights and liabilities of the parties. *Buccino v. Continental Assurance*, 578 F.Supp. 1518 (S.D.N.Y.1983).

Likewise, the amendment to § 1451(a) goes beyond merely affecting procedural mechanisms and alters the rights of naturalized citizens. Although the district court is correct in stating that the statute applies to denaturalization proceedings rather than the granting of the substantive right, 600 F.Supp. at 1268, it can hardly be characterized as not impairing the right of citizenship held by naturalized individuals. The "illegal procurement" amendment operates to divest an individual of the prized status of citizenship when prior to its 1961 passage that right was vested after 1952 (see *infra* note 12). See *Schneiderman*, 320 U.S. at 122, 63 S.Ct. at 1335. Therefore, the inquiry is whether the amendment changes the legal consequences of acts completed before its effective date. *Weaver v. Graham*, 450 U.S. 24, 31, 101 S.Ct. 960, 965, 67 L.Ed.2d 17 (1981). Here most certainly the legal consequences of Kairys' being a Nazi camp guard at Treblinka has changed; between 1952 and 1961 there was no "illegal procurement" standard so that the government could not use that standard to denaturalize Kairys, whereas since 1961 the government could use that standard to deprive him of citizenship.

It remains to determine whether Congress has expressed sufficient intent to apply the 1961 "illegal procurement" amendment retroactively, as the government contends. As already noted, statutes are to be construed as prospective unless otherwise stated. *Greene v. United States*, 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964); *Hospital Employees Labor Program v. Ridgeway Hospital*, 570 F.2d 167, 169-70 (7th Cir.1978); *South East Chicago Cm.*, 488 F.2d 1119; IA C. Sands, *Sutherland on Statutory Construction*, § 22 at 200 (4th ed. 1972). This rule is even more appropriate when the statute affects vested rights. *Bradley v. Richmond School Bd.*, 416 U.S. 696, 720–21, 94 S.Ct. 2006, 2020–21, 40 L.Ed.2d 476 (1974).

Nonetheless several factors demonstrate congressional intent to apply the amendment to pre-1961 grants of citizenship. The district court found the strongest indication of such intent in 8 U.S.C. § 1451(i), which states that the entire provisions of § 1451 are to be applied to "any naturalization granted under this subchapter" and to

"any naturalization heretofore granted." [11] Therefore, when Congress amended § 1451(a) it was already a retroactive subsection by virtue of subsection (i). To emphasize, the amendment was placed in a section already governed by a separate provision for retroactivity, a provision of which Congress was presumably aware when passing the amendment to § 1451(a). This interpretation is consistent with the purpose of the illegal procurement provision. Congress reinserted [12] the illegal procurement standard in § 1451(a) in order to effectuate the purposes of both the naturalization and denaturalization statutes. See H.R.Rep. No. 1086, 87th Cong., 1st Sess. (1961), *reprinted in* 1961 U.S.Code Cong. & Admin.News 2950, 2982–84. Congress did not want individuals who were not properly qualified or had not properly completed the required initial steps to acquire and retain American citizenship. It would be completely illogical to conclude that Congress intended the illegal procurement denaturalization standard to apply to pre-1952 Act and post-1961 Act naturalizations and not to others such as this 1957 grant. That conclusion would serve to make the denaturalization requirements ineffective for naturalized citizens such as the defendant. Given this broadening of the statute's scope (by reinserting the illegally procured standard into § 1451(a)) Congress surely did not mean to create a loophole class of people who would not be subject to the new (1961) version of the statute. See *Hutchinson v. Commissioner*, 765 F.2d 665, 669 (7th Cir.1985).

Finally, when Congress wished to make provisions prospective in the 1961 Act (of which this amendment to § 1451(a) is a part) it expressly did so,[13] still another indication that the provision at issue was meant to be retroactive. Therefore, we are unwilling to ascribe a contrary intent to Congress by giving the 1961 "illegal procurement" amendment only a prospective effect.

### 2. *Ex Post Facto*

The defendant argues that the retroactive application of the 1961 amendment to his 1957 citizenship violates the constitutional prohibition against *ex post facto* laws, U.S. Const. art. I, sec. 9, cl. 3. The defendant's argument is unpersuasive.

■■■ Denaturalization is a civil rather than criminal proceeding. See *Fedorenko*, 449 U.S. at 516, 101 S.Ct. at 752; *Schellong v. United States*, 717 F.2d 329, 336 (7th Cir.1982), certiorari denied, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). Additionally, the purpose of the denaturalization statute is not to punish citizens, but to protect the integrity of the naturalization process. *Fedorenko*, 449 U.S. at 506–07, 101 S.Ct. at 747–48. Although sometimes harsh, § 1451(a) merely works to effectuate the intentions of Congress that only those qualified may become and remain citizens. Specifically, the denaturalization statute does not punish naturalized citizens for post-naturalization acts, and for this reason the cases cited by Kairys are distinguishable. See *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958); *Kennedy v. Mendoza-Martinez*,

---

**11.** 8 U.S.C. § 1451(i) provides:
   The provisions of this section shall apply not only to any naturalization granted and to certificates of naturalization and citizenship issued under the provisions of this subchapter, but to any naturalization heretofore granted by any court, and to all certificates of naturalization and citizenship which may have been issued heretofore by any court....

**12.** Illegal procurement subsections had already been incorporated into preceding denaturalization statutes. See § 15, Act of June 29, 1906, 34 Stat. 596, 601; § 338(g), Nationality Act of 1940, 54 Stat. 1137, 1160. In the 1961 Act

Congress re-added the "illegally procured" language to the prior § 1451(a) language "procured by concealment of a material fact or willful misrepresentation." The "illegally procured" language had been inexplicably and apparently inadvertently dropped from the 1952 Act. See *United States v. Stromberg*, 227 F.2d 903 (5th Cir.1955).

**13.** See §§ 17 and 19, Pub.L. No. 87–301, 75 Stat. 656; H.R.Rep. No. 1086, 87th Cong., 1st Sess. 38–41 (dealing with petitions for naturalization and loss of United States citizenship, respectively).

372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). The Supreme Court recognized in *Johannessen v. United States* that a denaturalization proceeding imposes no new penalties and does not make unlawful that which was previously lawful. 225 U.S. 227, 242–43, 32 S.Ct. 613, 617–18, 56 L.Ed. 1066 (1912). Rather it works to deprive the naturalized citizen of a privilege that should never have been bestowed. *Id.*; see also *Koziy*, 728 F.2d at 1320 ("The utilization of illegal procurement deprived Koziy of a privilege that was never rightfully his.").

Because denaturalization proceedings are not criminal in nature and do not inflict punishment, the retroactive application of the amendment does not violate the prohibition against *ex post facto* laws.

B. *Equal Protection*

The defendant also asserts that the illegal procurement standard violates the equal protection clause of the Fifth Amendment. His reasoning is that because intentional and voluntary acts are required for expatriation of native-born citizens, *Afroyim v. Rusk*, 387 U.S. 253, 87 S.Ct. 1660, 18 L.Ed.2d 757 (1967); *Schneider v. Rusk*, 377 U.S. 163, 84 S.Ct. 1187, 12 L.Ed.2d 218 (1964), intentional acts must also be the basis for denaturalization of naturalized citizens. This argument, however, ignores the intrinsic differences between the two types of citizenship, as well as the long history of the illegal procurement standard in denaturalization statutes—upheld by the Supreme Court. See *Fedorenko*, 449 U.S. at 517–18, 101 S.Ct. at 752–53; *United States v. Ness*, 245 U.S. 319, 321, 38 S.Ct. 118, 119, 62 L.Ed. 321 (1917); *United States v. Ginsberg*, 243 U.S. 472, 474–75, 37 S.Ct. 422, 423, 61 L.Ed. 853 (1917); *Luria v. United States*, 231 U.S. 9, 22–24, 34 S.Ct. 10, 13, 14, 58 L.Ed. 101 (1913).

American citizenship is a precious right and consequences of its loss may be severe. See *Costello*, 365 U.S. at 269, 81 S.Ct. at 536; *Chaunt*, 364 U.S. at 353, 81 S.Ct. at 149; *Baumgartner v. United States*, 322 U.S. 665, 675–76; *Schneiderman*, 320 U.S. at 122, 63 S.Ct. at 1335. Naturalization is not a second-class status. *Schneider v. Rusk*, 377 U.S. 163, 165–66, 84 S.Ct. 1187, 1188–89, 12 L.Ed.2d 218 (1964). The Fourteenth Amendment provides that all citizens are equal, whether native or naturalized. U.S. Const. amend. XIV. Congress has the power to regulate the naturalization process, U.S. Const. art. I, § 8, cl. 4,[14] which includes detailing both the requirements for naturalization and the standards for denaturalization.

Section 1451(a) is a proper exercise of Congress' power to set the requirements for naturalization and to authorize denaturalization in the event of noncompliance. It does not act unequally upon naturalized citizens to remove their citizenship when they have failed to comply with the requirements of naturalization. *Luria*, 231 U.S. at 24, 34 S.Ct. at 13 (illegal procurement "makes no discrimination between the rights of naturalized and native citizens"). Rather the difference in treatment is due to the inherent differences in the two types of citizenship; for natives there are no pre-citizenship acts to prescribe.

The cases cited by the defendant are inapplicable. *Schneider* and *Afroyim* do stand for the propositions that naturalized and native citizens must be treated equally and that before any citizen can be expatriated or denaturalized there must be a voluntary and intentional act. But this standard applies only to acts committed after citizenship. Because there are no analogous pre-citizenship requirements for native-born individuals, naturalized citizens are not being treated any differently than their intrinsic differences require.

Furthermore, the Supreme Court in *Fedorenko* continued its acceptance of illegal procurement as a basis for revocation of citizenship both by using that standard as a

---

**14.** The Constitution empowers Congress to "establish an uniform Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4.

basis for its decision, 449 U.S. at 515, 101 S.Ct. at 751, and by references to *Ginsberg* and *Ness*,[15] 449 U.S. at 517–18, 101 S.Ct. at 752–53. Moreover, the Court, recognizing the facial inconsistency, reconciled the diverging concepts of *Schneider-Afroyim* and *Ginsberg-Ness. Id.* at 505–07, 101 S.Ct. at 746–48. Because Kairys' argument is inconsistent with this controlling Supreme Court authority, it must fail.

### III. LACHES

The defendant protests that this action should be barred by laches. We do not consider it necessary to reach that question because the defendant cannot meet the necessary requirement to assert a laches defense. In *Costello v. United States*, 365 U.S. 265, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961), the Supreme Court addressed the issue of whether or not laches barred the government from proceeding against the defendant in a denaturalization proceeding. There the Court noted that the lower courts had consistently disapproved of the use of laches in denaturalization proceedings, reasoning that laches is not a defense against the sovereign. *Id.* at 281, 81 S.Ct. at 543 and cases cited therein. The Court went on to hold that in any event the defendant had not adequately demonstrated prejudice. *Id.* at 282–83, 81 S.Ct. at 543–44. In this case the district court noted that the defendant would probably fail in meeting the laches standard. 600 F.Supp. at 1264 n. 3. To assert the laches doctrine a party must demonstrate lack of diligence and prejudice. *Costello,* 365 U.S. at 281, 81 S.Ct. at 542. Here the government was unaware of Kairys' illegal presence until 1977. Suit was brought in August of 1980 after a Department of Justice investigation. We agree with the district court that this would not rise to the level of lack of diligence. See also *United States v. Trifa,* 662 F.2d 447 (6th Cir.1981),

certiorari denied, 456 U.S. 975, 102 S.Ct. 2239, 72 L.Ed.2d 849 (1982).

### IV. JURY TRIAL

The defendant claims that the trial court erred in not granting his request for a jury trial. He asks this Court to overturn past decisions clearly holding that there is no right to a jury in denaturalization proceedings, *Luria v. United States,* 231 U.S. 9, 27–28, 34 S.Ct. 10, 15, 58 L.Ed. 101 (1913); *Schellong,* 717 F.2d at 338. We are not prepared to do so.

This Court reconsidered this issue recently both in *United States v. Walus,* 616 F.2d 283, 304 n. 53 (7th Cir.1980), and in *United States v. Schellong,* 717 F.2d 329, 338 (7th Cir.1983), and has continued to uphold the ruling of *Luria* that there is no right to a jury in denaturalizations because they are proceedings in equity. See *Fedorenko,* 449 U.S. at 516, 101 S.Ct. at 752 (reaffirming that denaturalization actions are equitable in nature). In *Schellong* this Court discussed alternative constitutional bases for a right to jury trial under Article III and the Sixth Amendment. Ultimately this Court concluded that because denaturalization is civil and equitable in nature, due process was satisfied by a fair trial before an impartial decisionmaker. 717 F.2d at 336. We adhere to those holdings.

### V. CONCLUSION

For the reasons stated above, the district court committed no error in the proceedings.[16] Accordingly, the order of the district court revoking the defendant's naturalization is affirmed.

---

15. Both *Ginsberg* and *Ness* were Supreme Court decisions that upheld denaturalizations of citizens under the 1906 illegal procurement standard; both involved unintentional acts before citizenship.

16. Because we conclude that the defendant's citizenship was illegally procured, as alleged in Count II of the complaint, we do not consider the government's cross-appeal arguments that Counts I and III (alleging willful concealments and misrepresentations of material facts) were improperly dismissed by the district court.