HAROLD R. CORNWALL & others [1] vs. ALEXANDER D. FORGER, trustee.

No. 88-P-190.

Dukes County. January 11, 1989. — May 22, 1989.

Present: BROWN, KASS, & SMITH, JJ.

*Real Property*, Conveyance, Ownership, Record title. *Practice, Civil*, Findings by judge, Appeal. *Custom. Limitations, Statute of.*

In an action brought under G. L. c. 237, § 3, by plaintiffs claiming title to certain land in Gay Head on Martha's Vineyard, a judge of the Land Court properly ruled, on the evidence and testimony before him, that the plaintiffs had not established either that the person from whom the defendant ultimately traced his title had never acquired title to the locus or that the plaintiffs were heirs-at-law of the original deedholder. [338-340]

A judge of the Land Court hearing a complaint brought under G. L. c. 237, § 3, in which the plaintiffs claimed title to a parcel of land on Martha's Vineyard as heirs-at-law of the original deedholder, an Indian of the Gay Head Tribe, did not err in considering, as an element of the plaintiffs' failure to meet their burden of proof, that they adduced no evidence of tribal custom with respect to descent, distribution, and adoption as that would affect title to the locus in question. [340-341]

An action to recover certain land, brought pursuant to G. L. c. 237, § 3, was not barred by the twenty-year statute of limitations set forth in G. L. c. 260, § 21, where the claim was based on an allegation that the grantor of a 1901 deed to the locus, which was at all material times unoccupied, unfenced and wild land, had no title when he conveyed the property. [341-342]

CIVIL ACTION commenced in the Land Court Department on December 1, 1986.

The case was heard by *Robert V. Cauchon*, J.

*E. Macey Russell* (*Isaac H. Peres* with him) for the plaintiffs.
*Allan van Gestel* for the defendant.

---

[1] Cora Cornwall Lopez, Martha Cornwall Royster, Doreen C. Cornwell, and Robert F. Cornwell.

KASS, J. Upon a complaint brought under G. L. c. 237, § 3 (writ of entry), the plaintiffs claim title to a strategically located parcel of land, known as Lot 540, in Gay Head on Martha's Vineyard. A judge of the Land Court ruled that the plaintiffs had not established ownership of Lot 540, a decision which left the competing claim of title of Alexander D. Forger, trustee, as the superior one. The dispute arises because of a break in the chain of title which occurred between 1878 and 1901. We affirm.

Lot 540 was carved from Indian Lands in 1878 under authority of St. 1870, c. 213. That act incorporated the town of Gay Head and authorized commissioners to convey lots of tribal lands to members of the Gay Head tribe. In the language of the original deed, Lot 540 "was drawn by William C. Mingo — Census No. 99 — a minor, born February 19, 1862." Forger, who took a deed to Lot 540 in 1978,[2] traces his title to a deed given in 1901 (recorded April 2, 1901) by Charles H. Mingo to Marshall W. Norton. The Charles Mingo to Norton deed was followed by a series of eight orderly conveyances of record which in 1943 brought title down to a corporation called Cape Cod Company. That corporation sold land including the locus to Forger on January 16, 1978. The deed reflecting that sale was recorded two days later.

There was, however, no deed of record from William Mingo to Charles Mingo, nor was there any probate of William's estate in Massachusetts by which title might have vested in Charles. To establish whether the plaintiffs had a claim to the locus as heirs-at-law of William, the parties were remitted to the product of genealogical sleuthing. This they enthusiastically served up to the Land Court judge, who found that the plaintiffs had not sustained their burden of proving that Charles had never acquired title to the locus.

We sketch some of the facts found by the Land Court judge, for which there was evidentiary support. Both William and Charles Mingo were Gay Head Indians. Charles was William's

---

[2] The title gap in record title which gives rise to this action came to light during the course of proceedings brought by Forger to register his title.

natural father and the name bestowed on the son was that of his paternal grandfather. For a portion of his life William resided in the household of his father. As a young man William left Gay Head, apparently to follow a life at sea, and vanishes from the plot, possibly by reason of marine disaster.[3]

The plaintiffs stake their claim through a half sister of William's, Mary Ellen Peters, born December 17, 1866. Her family name is that of her biological father. In order to follow the genealogical line to the plaintiffs, it is necessary to assume that a Mary *Alice* Peters, from whom the plaintiffs trace themselves, was the same person as Mary *Ellen* Peters. That was a leap which the judge was unwilling to make. He thought the genealogical evidence to be conflicting and ambiguous, thus not constituting a preponderance of evidence on the point to be established: that the plaintiff claimants were heirs — indeed they claimed *sole* heirs — of William Mingo. The judge's decision turns on his findings of fact and the plaintiffs, therefore, face the formidable task of demonstrating that those findings of fact are clearly erroneous. Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974).

On the ground that the pivotal evidence consisted of documents, the claimants ask us to make our own independent appraisal of the evidence. Whether an appellate court may examine documentary evidence afresh was a question touched on in *First Pennsylvania Mortgage Trust* v. *Dorchester Sav. Bank*, 395 Mass. 614, 621 n.11 (1985), and expressly left open in *Rapp* v. *Barry*, 398 Mass. 1004, 1004 n.3 (1986). In the instant case, the question is not to the point because the evidence was far from exclusively documentary. The plaintiff brought seven witnesses to the stand for their oral testimony. When the evidence is of mixed character — live and documentary — it is settled that the clearly erroneous standard applies to both categories. *Markell* v. *Sidney B. Pfeifer Foundation, Inc.*, 9 Mass. App. Ct. 412, 429-430 (1980).

1. *Findings.* Neither of the decisive findings made by the judge is clearly erroneous. Both have support in the record.

---

[3] The judge did not think the death at sea hypothesis proved. Nothing seems to turn on it.

a) *Charles Mingo was William Mingo's father*. Documentary evidence consisting of Indian censuses prepared by legislative commissions[4] and Federal decennial censuses disclose a William Mingo, age ten, living in the household of Charles Mingo in 1870. Mary C. Jeffers is listed as the mother of the William Mingo (variously reported as born February, 1860, and February, 1862) in the Charles Mingo household. The judge drew a further inference of a father and son relationship between Charles and William from the circumstance that William was given the name of Charles's father. The judge could have viewed as corroborative so much of an "old timer's" affidavit (that of Linus S. Jeffers) as said that William Mingo was taken to live with Charles who brought him up and that Charles assumed he was the only heir of "Willie", while discounting that part of the affidavit which said that Charles had not adopted William. The Vanderhoop affidavit, which recited the children lawfully born to Charles and his wife Rebecca, did not tend to disprove the relationship between Charles and William, who had been born out of wedlock.

b) *Mary Ellen Peters was not Mary Alice Peters*. Apart from the difference in name, there was a difference in the birth date (December 22, 1867) of Mary Alice Peters (after marriage she was Mary Cornwall), from whom the claimants trace descent, and that (December 17, 1866) of Mary Ellen Peters, the half sister of William Mingo. The evidence pointed to no link between Mary Jeffers, William's mother, and Mary Alice Cornwall. Records list her as the daughter of a Samuel Peters, who had nothing to do with William. To be sure, Mary Alice Cornwall is from Gay Head but the census records reflect that Peters was a common name on Martha's Vineyard. In sum, there is support for the judge's finding that Mary Ellen Peters and Mary Alice Peters were not the same person. The claimants' case founders on that finding alone.

---

[4] Senate Doc. 96, Earle, Report to the Governor and Council Concerning the Indians of the Commonwealth (1861). Pease, Report of the Commissioner Appointed [Pursuant to Resolves 1866, c. 67] to Complete the Examination and Determination of All Questions of Title to Land and of All Boundary Lines Between the Individual Owners at Gay Head on the Island of Martha's Vineyard (1871).

We need not consider other details about which the claimants cavil. It is sufficient to say that the evidence was conflicting and required considerable stitching together of inferences from old documents.[5] Not only are the trial judge's findings supportable in the evidence, they are wholly plausible, particularly as they are also consistent with the eighty-six year old chain of title which had developed by the time the case was tried.

2. *Indian tribal custom and law.* In the course of his decision the trial judge posits that tribal custom and law may have established Charles Mingo as the sole successor in title of William. The judge does not so find but takes as an element of the failure of the claimants to meet their burden of proof that they adduced no evidence of tribal custom. In their appeal, the claimants urge that this is so basic an error that it taints the balance of the judge's findings. That is a rather portentous consequence to ascribe to a parenthetical observation by the judge. In any event, the judge's ruminations about Indian customs were substantially correct.

Congress and the Bureau of Indian Affairs have recognized that the Gay Head Indians have survived as a tribe. 25 U.S.C. § 1771(7), as enacted by Pub.L. 100-95, § 2 (1987). 52 Fed. Reg. 4193 (1987). See also *James* v. *United States Department of Health & Human Services*, 824 F.2d 1132, 1136 (D.C. Cir. 1987). Such a determination is not lightly disregarded by a court. *United States* v. *Sandoval*, 231 U.S. 28, 47 (1913). *Joint Tribal Council of the Passamaquoddy Tribe* v. *Morton*, 528 F.2d 370, 377 (1st Cir. 1975). As a tribe, the Indians were subject to a considerable extent to their own traditional

---

[5] Seizing on an observation by the judge that the old documents are incomplete and ambiguous, the claimants argue that the judge gave them insufficient weight. A trier of fact is not required to accord special weight to documents by reason of their antiquity. See *Lowell* v. *Boston*, 322 Mass. 709, 718, appeal dismissed sub nom. *Pierce* v. *Boston*, 335 U.S. 849 (1948); *United States* v. *Koziy*, 728 F.2d 1314, 1322 (11th Cir.), cert. denied, 469 U.S. 835 (1984); *United States* v. *Kairys*, 782 F.2d 1374, 1379 (7th Cir.), cert. denied, 476 U.S. 1153 (1986); *Estate of Nidever*, 181 Cal. App. 2d 367, 378 (1960). In any event, as the ancient documents in this case were Janus-faced, the point is really not so much their weight as what is to be gleaned from them.

law and customs, rather than State law. *United States* v. *Wheeler*, 435 U.S. 313, 322-323 (1978). Cohen, Handbook of Federal Indian Law 232-237 (1982 ed.).

An illustration of the primacy of tribal law and custom in circumstances evocative of the instant case appears in *Jones* v. *Meehan*, 175 U.S. 1 (1899). There the Department of the Interior appeared to have assumed "that upon the death of Moose Dung the elder [a Chippewa chief], in 1872, the title in his land descended by law to his heirs general, and not to his eldest son only.

"But the elder Chief Moose Dung being a member of an Indian tribe, whose tribal organization was still recognized by the Government of the United States, the right of inheritance in his land, at the time of his death, was controlled by the laws, usages and customs of the tribe, and not by the law of the State of Minnesota, nor by any action of the Secretary of the Interior." *Id.* at 29.

Until 1870, title to the Gay Head Indians' land was held on behalf of the tribe as a whole. That tribe's semi-autonomous governance, coupled with application of the principle set forth in *Jones* v. *Meehan*, supports the judge's hypothesis, that local custom as to descent, distribution, and adoption would have been probative of how title to the locus might. have passed from William to Charles.

3. *Statute of Limitation.* Forger, the defendant, invites us to rule that G. L. c. 260, § 21, which requires an action for recovery of land to be commenced within twenty years of when the right accrues, bars the claim of the plaintiffs. The recording in 1901, the argument runs, of the deed of Charles Mingo to his grantee, Marshall Norton, was notice to the world of the claim of Charles to title in the locus and that the right of action, thus, accrued. It is a tempting argument because it has the attributes of simplicity and finality, and it supports the integrity of the land records system. Cf. *Swasey* v. *Emerson*, 168 Mass. 118, 120 (1897).

Decisional law, however, is to the contrary. Delivery and recording of a deed of land to which the grantor has no title does not effect a disseisin. A more forceful act of ouster on

the land itself is required. *Bates* v. *Norcross*, 14 Pick. 224, 229-230 (1833). *Coburn* v. *Hollis*, 3 Met. 125, 128 (1841). Compare *Perry* v. *Kline*, 12 Cush. 118, 125 (1853), in which the grantee occupied the land in question. At the times material, the locus in this case was unoccupied, unfenced wild land. There was — understandably — no claim of adverse possession. Perhaps it would be salutary if, after a certain time, a chain of title based on a recorded deed were immune to collateral attack. Revision of established law concerning periods of limitation is, however, a task properly within the province of the Legislature.[6]

The Land Court judge rightly decided that the plaintiffs had not established an ownership interest in Lot 540 located in Gay Head, County of Dukes County.

*Judgment affirmed.*

---

[6] A rule of thumb for record searches, set out in Mass. Conveyancers Assoc. Title Std. No. 1, is fifty years to a warranty or quitclaim deed. See Mendler, Massachusetts Conveyancers' Handbook § 5:3 (3d ed. 1984). Precisely how long the period of search should be, however, involves an element of judgment. *Ibid*. A fifty-year search would not have unearthed the trouble spot in the title to Lot 540. The Land Court examiner went back further because he knew Gay Head titles had their origins in the "set off" of 1878 and apparently judged that it would be well to look at the point of beginning.