**W. Kelly SMITH, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 18045.**

United States Court of Appeals
Fifth Circuit.

Feb. 8, 1961.

Alto V. Watson, Beaumont, Tex., Watson & Selman, Beaumont, Tex., of counsel, for appellant.

Anthony Mondello, Samuel D. Slade, Seymour Farber, Morton Hollander, Attys. Dept. of Justice, Washington, D. C., Paul N. Brown, U. S. Atty., Tyler, Tex., George Cochran Doub, Asst. Atty. Gen., for appellee.

Before TUTTLE, Chief Judge, and JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

After a trial without a jury the District Court held that Smith, Executive Director of a governmental housing project was liable under the False Claims Act, 31 U.S.C.A. § 231, to repay the Government double the amount of the payments wrongfully received plus the further statutory penalty of $2,000 for each

of the two false claims. Three contentions are now pressed. First, the evidence was not sufficient to sustain the basic finding of false claims. Second, even if false, the certifications for payment were not claims within the Act. Third, the Government's claim was barred by the six-year statute of limitation, 31 U.S.C.A. § 235.

Smith, an accountant by business training, was the Executive Director of the Beaumont Housing Authority (BHA). As such, he was responsible for operating several housing projects in Beaumont. He had held the position for some time. BHA was the lessee of a project owned by the Federal Government through the Public Housing Administration. Under the lease BHA agreed to pay as rental the amount by which operating revenues exceeded approved expenses for the preceding quarter. Under other provisions the Government agreed to advance funds to cover operating deficits. Quarterly reports had to be filed by the lessee reflecting the amount due to, or due by, the Government depending on whether operations reflected a surplus or a deficit for that quarter.[1]

The two false claims involved here grew out of the quarterly reports dated June 30, 1951 and September 30, 1951. The challenged items related primarily to purchase, transportation and delivery of shell. Also challenged were smaller items for work performed by a project laborer on Smith's farm while on the project payroll time. Whatever question there might be about whether the transactions were false or fraudulent, it is uncontradicted that the inclusion of the items had a direct and immediate effect on the Federal Treasury. In one quarter the amount of rental payable *to* the Government was reduced. In the other the amount of the advance payable *by*

1. The lease contained the usual conflict of interest prohibition. "No member, officer, agent or employee of the Lessee shall have any personal interest, direct or indirect, in any contract for property, materials, or services made or furnished in connection with the performance of any of the lessee's undertaking under this lease."

the Government to make up the deficit was increased.

■■ The attack on the Court's findings of fact is the not unnatural one that the Trial Judge ought not to have found as he did. But this misconceives our function. We do not retry the case. Williams v. National Surety Corp., 5 Cir., 1958, 257 F.2d 771, 773. We may determine only whether the findings pass muster under the clearly erroneous concept of F.R.Civ.P. 52(a), 28 U.S.C.A. The burden of upsetting these findings is indeed formidable here since the witnesses were all heard and seen by the Judge in open court and the crucial issues of motive and purpose involved credibility choices of the most elemental nature. United States v. Yellow Cab Co., 1949, 338 U.S. 338, 341–342, 70 S.Ct. 177, 94 L.Ed. 150. This required approach eliminates the necessity for any extended review of the evidence.

During April to September 1951 considerable rehabilitation was undertaken on one of the projects. This required the purchase and delivery of a substantial amount of shell. All of it came from the Jefferson Shell Company. The amounts here in dispute were covered in ten checks totaling $4170.75. Each of these checks of BHA was signed by Smith along with others. However, the checks were not payable to Jefferson Shell. Rather each was payable to Morris Celestine, a nearly illiterate laborer on the payroll of BHA. But Celestine did not get the money. For as each check was cashed, he turned all of the proceeds over to Smith. Smith did not undertake to deny this. On the contrary, he admitted that this arrangement had been set up by him. He had, indeed, taken Celestine to the bank to establish the system for cashing the checks.

It was Smith's story that there was an emergency to get this shell purchased and delivered within the two fiscal quarters for which Federal funds had been allocated. There was, he asserted, a shortage of trucks in Beaumont. Consequently, after informally clearing it with the Chairman of the Board of Commissioners of BHA, it was agreed that Smith would make use of his truck, owned personally by him, for this job. Celestine, already employed by BHA would drive the truck without extra pay. Smith, in the meantime, made an arrangement with Jefferson Shell to supply the shell. The shell was to be paid for by Smith when Smith received funds from BHA. As there was a fairly well locally established scale for transportation charges on a cubic yard basis, the price to be charged by Jefferson Shell was to include the transportation charge. Out of the proceeds of each Celestine check Smith would, therefore, retain the amount included for transportation as compensation for the use of his truck and as reimbursement to him for truck expenses. The balance would be paid to Jefferson Shell in payment for the shell physically delivered to Celestine.

Smith was emphatic that every load of shell thus paid for was delivered to the project, and that the money received by him from Celestine, less the transportation charges, was paid over to Jefferson Shell. At the time each of the checks was signed, it was supported by an invoice purchase order for each load which Celestine would surrender to the project office, and also a receiving order receipt signed by the project warehouseman attesting to the actual receipt of each load. There seems to be no doubt that Mrs. Webb, the BHA accounting clerk responsible for preparation of the checks, had the proper paper support for each check. But Smith personally prepared the vouchers showing the sale of the shell by Jefferson Shell to Celestine.

■ If Smith's story were credited, the case would then have turned on perhaps the more doubtful question whether handling the payment in this unorthodox fashion, but without profit to Smith, would have been false or fraudulent under the Act simply because the use of Smith's truck and the payment for it at the going rate violated the conflict of interest terms of the lease, see note 1, su-

pra, and also a Texas statute making such insider transactions illegal.[2] Under the statutory scheme of a civil judgment for the *amount* of the damage sustained by the Government through the fraudulent claim and a like amount as a civil penalty, it would have been impossible to have avoided decision on that point. But the Court did not credit this story. On the contrary, it expressly found that Smith "received personally the proceeds of each of said checks" and more important, that "none of said checks was issued for any * * * materials furnished to or for the" BHA.

It is not for us to say what we would have held were it our decision to make. We need only briefly summarize some circumstances that made this damaging conclusion permissible. A spectacular piece of evidence was the fact that Jefferson Shell's books reflected a specific account with BHA covering shell delivered during this same period of time. The total amounted to $2,412.85. Checks of BHA, likewise signed by Smith, payable to Jefferson Shell were identified for this precise amount.[3] Smith never ventured an explanation as to why it was necessary to have both accounts—the official BHA and the Celestine accounts—at Jefferson Shell. If the "emergency" was a shortage of trucks, the Court was entitled to be skeptical since Smith's truck was used for the "official" movements and, according to him, for the Celestine shipments as well, see note 3, supra. As a matter of fact, no such emergency was ever really established.

■■ Another circumstance related to the supporting delivery receipt which Smith testified was signed by the warehouse department for each load. Celestine was positive that no one signed any such receipt. Since this actual receipt was not produced, Mrs. Webb's assurance that all was in order was greatly imperiled. Next, while a plea of *nolo contendere*, as such, may not be received or used as an admission of civil or criminal liability, Piassick v. United States, 5 Cir., 1958, 253 F.2d 658; Mickler v. Fahs, 5 Cir., 1957, 243 F.2d 515, no objection was made to the evidence, so the conviction[4] based on it was a relevant circumstance on the credibility of Smith as a witness. Kilpatrick v. Commissioner, 5 Cir., 1955, 227 F.2d 240, 243. Along these same lines and bearing directly on the credibility of Smith was the marked contrast between explanations made by him as a witness in Court and those expressed previously in statements given to Government investigators.

Of course the evidence was not all one way, as it seldom is. One of the strongest arguments advanced below by Smith was that the supporting delivery and receipt tickets attached to the BHA voucher had been routinely destroyed. This

2. Tex.Civ.Stat. Art. 1269k, § 6 (Vernon 1953).

"Sec. 6. No commissioner or employee of an authority shall acquire any interest direct or indirect in any housing project or in any property included or planned to be included in any project, nor shall he have any interest direct or indirect in any contract or proposed contract for materials or services to be furnished or used in connection with any housing project. If any commissioner or employee of an authority owns or controls an interest direct or indirect in any property included or planned to be included in any housing project, he immediately shall disclose the same in writing to the authority and such disclosure shall be entered upon the minutes of the authority. Failure to so disclose such interest shall constitute misconduct in office."

3. Following the industry billing practice, Jefferson Shell had included transportation charges in its bills to BHA. Smith's truck was used for transporting at least a considerable part of this shell. In payment for this transportation Jefferson Shell sent Smith its check for $329.70 computed on the basis of .70 per cubic yard transportation.

4. Smith had entered a plea of *nolo contendere* to an Information for violation of 18 U.S.C.A. § 1012 for making a false report in the quarterly report ending September 30, 1951 covering some of the items involved in the civil complaint. By the judgment of conviction, the same Court had imposed a $500 fine. Credit for this fine was given by the District Court in this civil case.

was particularly significant since the Jefferson Shell records covering "cash" deliveries—which these to Celestine were supposed to be—could not be located and the manager having personal knowledge of the transactions had since died. But, except as it bore on the legal contention which we shortly discuss, these were the typical contentions for evaluation by the trier of fact.

■ The most substantial attack is based on the absence of specific evidence showing by cubic yard or otherwise that only the shell represented by the "official" billing ($2412.85) was delivered and no part of the shell covered by the "Celestine" billing ($4170.75) was. In effect Smith argues that it was a part of the Government's affirmative case to establish that all of the shell received on the project was covered solely by the "official" billing, that none of the "Celestin" shell was. While the burden of proof was on the Government which it had to carry as would any other litigant, National Rag & Waste Co. v. United States, 5 Cir., 1956, 237 F.2d 846, the argument overlooks several things. First is the circumstantial evidence casting great doubt on whether any of the "Celestine" shell was ever shipped at all. Jefferson Shell's records did not show any such shipments. And contrary to Smith's insistence that this was to be handled as a "cash" item, there was enough to warrant the judge finding that had there been such deliveries for which payment was to be made at a later date, some record would have existed.

More important, however, was the legal significance of the admitted nature of this transaction. Quite apart from contract or state law violations (see notes 1 and 2), the whole procedure followed by Smith was unorthodox to say the least. Smith was signing vouchers and checks showing shell purchased from Celestine when, on his story, it was purchased by him for BHA from Jefferson Shell. Worse, he was signing checks payable to Celestine knowing that he, Smith, would get the money. None of these facts was anywhere recorded for inspection and auditing and the apparent record, to Smith's positive knowledge, painted quite a different picture.[5] The consequence of this was to put on Smith —just as it would on any private employee pursued by an employer asserting the servant's breach of fidelity—the burden of going forward with a suitable explanation accounting in full for all of the sums improperly handled. Smith may well have acted from the highest of motives, but the steps taken leave it all under a dark cloud of suspicion. Crude as it was, it was a method which an employee holding an evil purpose could have used to cheat. When used, it is up to the agent, not the principal, to establish that its use was honest, not dishonest.[6]

■ So far what we have said may have given the impression that the false claims were the signing, delivering and cashing of the checks. This is not the case. That discussion was to demonstrate the permissible basis for the Court's conclusion that the underlying transactions were a fraud. The false claims arose because Smith, as Executive Director, knowing the true facts to be otherwise signed the quarterly reports which included these disbursements as allowable expenses. No Federal money as such was paid to or received by Smith, Celestine or the "double timing" employee. The Federal Treasury suffered because BHA, having made the disbursements, got them back from the Federal Government either as an outright payment, or as a deduction of like amount

---

5. It was these same misrepresentations epitomized in the quarterly reports which constituted the false claim.

6. What we have said applies to the smaller item representing wages paid by BHA to the employee for time actually worked for Smith. No purpose would be served in reciting the details. The employee was emphatic and the Judge chose to believe him. The Court rejected the similar claim by the Government as to another employee.

from what otherwise would have been remitted by BHA as rental.

■ This leads Smith to assert on the basis of United States v. McNinch, 1958, 356 U.S. 595, 78 S.Ct. 950, 2 L.Ed. 2d 1001; United States v. Tieger, 3 Cir., 1956, 234 F.2d 589; United States v. Cochran, 5 Cir., 1956, 235 F.2d 131, that by filing these reports he did not "make or cause to be made * * * any claim upon or against the Government of the United States * * * knowing such claim to be false, fictitious, or fraudulent * * *." 31 U.S.C.A. § 231. But as United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443, makes so clear, the False Claims Act applies even where there is no direct liability running from the Government to the claimant. "Government money is as truly expended whether by checks drawn directly against the Treasury to the ultimate recipient or by grants in aid to states. * * * These funds are as much in need of protection from fraudulent claims as any other federal money, and the statute does not make the extent of their safeguard dependent upon the bookkeeping devices used for their distribution." 317 U.S. at pages 544–545, 63 S.Ct. at page 384. Had BHA not made these payments and had they not been reflected in the quarterly reports, the Government, in one quarter, would have received more rent and in the other would have made a lesser payment. The expenses were therefore ultimately borne by the United States Treasury. It was not the case of false certifications to obtain Federal credit as in McNinch and the others. The false claim resulted, as Smith knew it would, in the actual payment of Federal funds. That is sufficient. United States v. DeWitt, 5 Cir., 1959, 265 F.2d 393, 395; United States v. Rainwater, 1958, 356 U.S. 590, 78 S.Ct. 946, 2 L.Ed.2d 996, affirming 8 Cir., 244 F.2d 27.

■ Little need be said as to the statute of limitations. The six-year period is to be computed from the time of "the commission of the act," 31 U.S.C.A. § 235. The "act" in question is the filing of the false claim. United States v. Borin, 5 Cir., 1954, 209 F.2d 145, 147. Only the first of two quarterly reports is involved. The original complaint was filed July 11, 1957. While that report was for the quarter ending June 30, 1951 (a date more than six years prior to the suit), the report itself and the record reflect that it was prepared and mailed to the United States Public Housing Administration on July 12, 1951. The action was therefore "commenced within six years from the commission of the act," 31 U.S.C.A. § 235.

Affirmed.