UNITED STATES of America, Plaintiff,

v.

ETTRICK WOOD PRODUCTS, INC., Stephen K. McLeod, Kenneth J. McLeod, Larry W. Rieck, United Bank of Osseo, Robert J. Ofsdahl, Robert O. Helstad, Defendants.

No. 87–C–595–C.

United States District Court,
W.D. Wisconsin.

Jan. 4, 1988.

David C. Sarnacki, Asst. U.S. Atty., Madison, Wis., for plaintiff.

William A. Kirkpatrick, Hale, Skemp, Hanson & Skemp, LaCrosse, Wis., for defendants.

## REPORT AND RECOMMENDATION

JAMES GROH, United States Magistrate Judge.

In this civil action, the United States asserts claims under the False Claims Act, 31 U.S.C. § 3729 *et seq.* (Counts I and II), and common law claims for fraud (Count III), breach of contract (Count IV) and unjust enrichment (Count V). All of the claims grow out of alleged false statements and misrepresentations in connection with the application for, and receipt of, loan guarantees from the Farmers Home Administration, an agency of the United States.

All defendants, except defendants Ettrick Wood Products, Inc. (hereafter "Ettrick") and Larry W. Rieck, filed motions to dismiss on a variety of grounds. However, plaintiff's claims against defendants Stephen K. McLeod and Kenneth J. McLeod have since been compromised and they have been, or are in the process of being, dismissed from the action. Therefore, no

further consideration of the McLeod motions (found at Docket ## 12 and 18) is required.

## FINDINGS OF FACT

For purposes of all motions, other than Helstad's motion for summary judgment, I find the following facts from the well-pleaded allegations of the complaint. (Dkt. # 2)[1]

1. The United States of America is plaintiff in this action, and this court has jurisdiction thereof pursuant to 28 U.S.C. § 1345 and 31 U.S.C. § 3732. (Compl. ¶¶ 1, 4)

2. Defendant Ettrick Wood Products, Inc. ("Ettrick") is a Wisconsin corporation with principal offices in Ettrick, Wisconsin. Defendant Larry W. Rieck and former defendants Stephen K. McLeod and Kenneth J. McLeod were all directors, officers and shareholders of Ettrick at all material times. (Compl. ¶¶ 5–8)

3. Defendant United Bank of Osseo (hereafter, "Bank"), a Wisconsin banking corporation, is the successor in merger with the Ettrick State Bank and has its principal offices in Ettrick, Wisconsin. Defendant Robert J. Ofsdahl ("Ofsdahl") was at all times material an officer and employee of the Bank. (Compl. ¶¶ 9–10)

4. Defendant Ronald O. Helstad was at all times material a partner in the LaCrosse accounting firm of Preeshl, Helstad, Shoup & Company. (Compl. ¶ 11)

5. The Farmers Home Administration ("FmHA") is an agency of the United States authorized to issue loan guarantees. (Compl. ¶ 12)

6. On May 27, 1980, Ettrick and the Bank submitted an Application for Loan and Guarantee to the FmHA. The application documents and supporting materials were primarily prepared by defendant Helstad and were signed by Stephen and Kenneth McLeod, defendant Rieck and defendant Ofsdahl. (Compl. ¶¶ 13–15)

7. In reliance on the application and supporting materials, the FmHA issued two conditional guarantee commitments to the Bank for two loans on or about June 23, 1980. Further documentation was required under the conditional commitments and on July 18, 1980, the Bank submitted a closing statement for its loans to Ettrick, which statement contained a certified schedule of disbursements describing how the loan proceeds were to be applied. The schedule certified that $291,824.17 was to be allocated for debt refinancing, including $252,122 owed by Ettrick to the Bank. The remaining funds were allocated for construction, real estate acquisition, machinery and equipment, and working capital. (Compl. ¶¶ 16–18)

8. The Bank also submitted the personal financial statements of defendants Rieck and Stephen and Kenneth McLeod signed by them and their wives. The financial statements certified to each person's net worth. The Bank also submitted the personal guarantees of the loans by the McLeods and Rieck and their respective wives. (Compl. ¶¶ 19–20)

9. On August 6, 1980, the Bank submitted a lender certification that Ettrick had marketable title to the collateral; that the required security instruments had been obtained; and that there were no actions, suits or proceedings which could result in any material adverse change in the business, operation or assets of Ettrick. The certification was signed by defendant Ofsdahl. (Compl. ¶¶ 21–22)

10. On August 12, 1980, based upon the loan application and the various supporting submissions, the FmHA issued two 90% loan guarantees for loans made by the Bank to Ettrick in the amount of $150,000 (20-year loan) and $350,000 (8-year loan). The terms of the loan guarantees were incorporated into the Lenders Agreement signed by Ofsdahl on behalf of the Bank, pursuant to which the guaranteed funds were to be used solely for the purposes certified in the application and supporting documents. On August 27, 1980, the Bank assigned the guaranteed portion of each loan to the Western–Southern Life Insurance Company. (Compl. ¶¶ 23–25)

1. The proposed findings with respect to the summary judgment motion appear *infra* p. 547.

11. On September 11, 1980, Ofsdahl disbursed approximately $416,000 of the guaranteed loans by paying 10 pre-existing notes held by the Bank. (Compl. ¶¶ 26–27)

12. The Bank never submitted fully audited annual or quarterly financial statements of Ettrick as required by the Lenders Agreement. (Compl. ¶ 28)

13. On July 17, 1981, acting under the Lenders Agreement, FmHA determined that liquidation of Ettrick was necessary due to financial difficulties, and on August 5, 1981, the Bank submitted a liquidation plan. (Compl. ¶¶ 29–30)

14. The Bank received notification that the fire insurance on Ettrick's assets was being discontinued. The fire insurance policy lapsed on November 17, 1981, and the assets of Ettrick were substantially damaged by fire on June 5, 1982. (Compl. ¶¶ 31, 34 & 35)

15. Following September 9, 1981, the loans were in default for over 60 days and Western–Southern Life Insurance Co. demanded that FmHA repurchase the guaranteed portions of the loan. The FmHA did so on November 3, 1981, paying Western–Southern $428,986. (Compl. ¶¶ 32–33)

16. The government did not have knowledge of facts material to this action over 6 years prior to the filing of the complaint on July 27, 1987.

17. The defendants knowingly presented false or fraudulent statements or claims to the FmHA as follows:

a. Misrepresented and understated the indebtedness of Ettrick to the Bank;

b. Misrepresented the personal net worth of Stephen and Kenneth McLeod by omitting certain mortgages held by the Bank on their residences;

c. Presented false certifications as to title and value of collateral taken to secure the loans in that Ettrick did not have marketable title in many instances, first liens were not obtained, and the value of collateral was overstated.

d. Defendants did not, and did not intend to, apply the loan proceeds as certified in the loan application and closing statement.

e. The certification as to pending actions, suits or proceedings failed to disclose an IRS tax lien against Ettrick. (Compl. ¶ 39)

18. Defendants knowingly made or used false records or statements to obtain payment of a false or fraudulent claim by the United States. The United States paid the claim, being unaware of the falsity thereof, and has been damaged in the amount of $452,000. (Compl. ¶¶ 40–42)

19. All of the defendants conspired to defraud the United States by obtaining payment of a false and fraudulent claim, to the damage of plaintiff of $452,000. (Compl. ¶¶ 43–45)

20. Defendants' false statements were material misrepresentations of fact made knowingly or with reckless disregard for the truth and with the intent that the United States rely upon them. The United States justifiably relied upon defendants' misrepresentations in approving and repurchasing the guaranteed portions of the loan, to its damage in the amount of $452,000. (Compl. ¶¶ 46–52)

21. Defendants' conduct was willful and egregious. (Compl. ¶ 53)

## SUPPLEMENTAL FINDINGS OF FACT—SUMMARY JUDGMENT

I find the following facts solely for the purpose of defendant Helstad's motion for summary judgment.[2]

1. Defendant Helstad, a resident of La-Crescent, Minnesota, is a member of the accounting firm of Preeshl, Helstad, Shoup & Company, Limited (hereafter, "the Firm").

2. The Firm has prepared tax returns for the Bank but has performed no auditing work or prepared financial statements for it. The Firm's average annual compen-

---

2. These findings are drawn exclusively from the uncontested affidavit of defendant Helstad (Dkt. # 23).

sation from the Bank over the past 5 years has been $932. Neither Helstad nor the Firm has any investment of financial interest in the Bank. Neither Helstad nor any member of the Firm have any investment or financial interest in Ettrick or in the McLeod Construction Company.

3. On November 6, 1979, Ofsdahl and Stephen McLeod asked Helstad to prepare an application for a Small Business Administration (SBA) loan. Helstad prepared an opening balance sheet from information furnished by Stephen McLeod and Ofsdahl, to which Helstad attached a disclaimer to the effect that the statement was based solely upon information furnished to the Firm, that it had not been audited or verified, and that no opinion was expressed with respect thereto. The SBA rejected the application in late 1979 or early 1980.

4. In February, 1980, the Firm was asked to prepare an application for an FmHA loan for Ettrick. Helstad and an employee, Rick Hamilton, performed most of the work in compiling a balance sheet and income statement to which was attached the following disclaimer:

The accompanying balance sheet of Ettrick Wood Products, Inc., as of January 31, 1980 and the related statement of income for the four months ended have been compiled by us.

A compilation is limited to presenting, in the form of financial statements, information that is the representation of management. We have not audited or reviewed the accompanying financial statements and accordingly do not express any opinion or any other form of assurance on them.

The financial statements and disclaimer were signed and submitted February 23, 1980.

5. On March 12, 1980, Ofsdahl, Stephen McLeod, and Helstad met with Robert Ruef, the Chief of Business and Industry with FmHA and informed him (Ruef) that the SBA loan had been turned down. Ruef was given a copy of the opening balance sheet provided to the SBA and a copy of the compilation for the period ending January 31, 1980.

6. Ruef subsequently came to Ettrick, Wisconsin. Helstad informed Ruef that he (Helstad) had no financial interest in either Ettrick or the Bank. Ruef then gave Ofsdahl and Stephen McLeod all of the FmHA application materials which they, in turn, delivered to the Firm for coordination and assembly of the information. The Firm performed the following work thereon:

(1) Prepared an unaudited balance sheet and income statement for the period ending March 31, 1980;

(2) Prepared projections for the FmHA loan (by partner Earl Engelson) based on information provided by Ettrick;

(3) Typed the personal financial statements [of the Ettrick principals] based entirely upon the unverified and unaudited information provided by the individuals.

7. As to the preparation of other parts of the application or supporting documents:

(1) The appraisal of physical assets was done by Stern Realty without any involvement of Helstad or the Firm.

(2) All information as to outstanding leases and loans was provided by Ettrick and no audit work was requested or performed;

(3) All other items of the application, including, but not necessarily by way of limitation, the application blank, the application for loan and guarantee, the form A–95 for the Mississippi River Planning Commission, the Environmental Impact Evaluation, the Flood Area Map, the Management Profile of Stephen McLeod and the letter from Ettrick were all prepared by others connected with either the Bank or Ettrick, and neither Helstad or the Firm played any part in the preparation thereof. (The completed application contained an unaudited balance sheet and income statement for the period ending March 31, 1980 and a projection to September 30, 1982, which was based upon information provided to the Firm.)

8. The application was completed May 23, 1980. Following the submission of it, neither Helstad nor the Firm was engaged to do anything for Ettrick until September 30, 1980. At that time the Firm was en-

gaged to conduct an audit of Ettrick's balance sheet as of September 30, 1980. The work was done by partner Earl Engelson and employee Rick Hamilton. Helstad reviewed some of the work papers and the financial report after it was completed. The income statement and retained earnings for the period ending September 30, 1980, were unaudited compilations due to inadequacies in Ettrick's accounting record.[3] The Firm was unable to express an opinion of the balance sheet. This work was completed in January, 1981, and the Firm performed no further work for Ettrick.

9. Helstad has received no financial gain in this transaction nor was any inducement offered him. He had no financial interest in any of the companies involved, had nothing to gain by the approval of the loan, and had nothing to do with its receipt or disbursement.

10. All of the information relating to the operations of Ettrick and the Bank and their principals, including Ofsdahl and Stephen McLeod were supplied by them.

## DISPUTED FACTS

1. That Helstad had no knowledge of any false statements or information nor reason to dispute the information provided to him.

2. That Helstad had no knowledge of any intent to defraud the government or the Bank and no reason to suspect any misrepresentations.

## CONCLUSIONS OF LAW

Defendants Bank and Robert J. Ofsdahl have moved to dismiss Counts I and II (arising under the False Claims Act) for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). As grounds for dismissal, they contend that the False Claims Act does not apply to applications for loan guarantees and, in any event, that the government's claims are barred by the statute of limitations. They also seek a declaration, in effect, with regard to the law to be applied—specifically, that the court apply the False Claims Act as it existed at the time of the offense, and not as it was amended in 1986.

Defendant Helstad has also moved to dismiss on limitations grounds, and separately seeks summary judgment on the issue of his lack of knowledge of the falsity of any information provided to the government.[4]

## I. Applicability of False Claims Act to Applications for Government Loan Guarantees

■ Defendants Bank and Ofsdahl (collectively, "the Bank") urge first that the False Claims Act does not apply to fraudulent applications for government loan guarantees. This contention is based upon a highly selective reading of *McNinch v. United States*, 356 U.S. 595, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958) and *United States v. Neifert–White Co.*, 390 U.S. 228, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968); a reading that has not, to my knowledge, received the endorsement of any other court.[5]

In *McNinch*, the government sought to impose the Act's statutory penalty upon persons in the home-improvement business who had caused lending institutions to file false applications for loan insurance (or loan guarantees) with the Federal Housing Administration (FHA). There had been no

---

3. These inadequacies are not described.

4. Defendants Bank, Ofsdahl and Helstad have also moved to dismiss Count III for failure to plead fraud with the requisite particularity. Fed.R.Civ.P. 9(b). None, however, has supported the motion with argument or authority, an omission which I construe as an abandonment of the motions. I will therefore recommend that those motions be denied. Defendant Helstad has also moved to dismiss Counts IV and V for failure to state a claim. However, an examination of the complaint reveals that no relief is sought against him under either of those counts, and those motions will therefore be denied as moot.

5. Defendant also suggests that *McNinch* be overruled. (Def. Reply Br. p. 3 (Dkt. # 28))

The conclusion seems inescapable that the result in *McNinch* was wrong.... It is unfortunate that respect for precedent has allowed *McNinch* to survive to this day without reversal.

default on any of the loans and no demand for payment by the FHA on the guarantees. The district court dismissed the complaint for failure to state a cause of action and the Supreme Court affirmed, holding that the mere application for loan insurance did not constitute a "claim against the government" within the meaning of the Act because the application itself did not bring about any disbursement of government funds or financial loss.[6]

> As the Court of Appeals for the Third Circuit said in this same context, 'the conception of a claim against the government normally connotes a demand for money or for some transfer of public property.' *United States v. Tieger*, 234 F.2d 589, 591. In agreeing to insure a home improvement loan the FHA *disburses no funds* nor does it otherwise *suffer immediate financial detriment.* [emphasis added]

*United States v. McNinch*, 356 U.S. at 599, 78 S.Ct. at 952. In the footnote immediately following, the court reserved ruling on the precise issue presented in the instant case:

> Since there has been no default here, we need express no view as to whether a lending institution's demand for reimbursement on a defaulted loan originally procured by a fraudulent application would be a "claim" covered by the False Claims Act.

*Id.* at 599, n. 6, 78 S.Ct. at 952, n. 6.[7]

The reserved question was, as the Bank acknowledges, directly confronted by the Third Circuit Court of Appeals in *United States v. Veneziale*, 268 F.2d 504 (1959), and that court held unequivocally that the False Claims Act applied.

> The claim before us now is certainly grounded in fraud in that a fraudulent misrepresentation induced the government to assume the obligation which it has had to perform. We are satisfied that the government, having been compelled to pay an innocent third person as a result of the defendant's fraud in inducing the undertaking, is entitled to assert a claim against the defendant under the False Claims Act.

*United States v. Veneziale*, 268 F.2d at 506. Since *Veneziale*, government claims based upon false applications for government insurance or guarantees on loans, as to which the government has been required to perform, have been entertained in other jurisdictions and, to my knowledge, have been rejected in none.[8] See *United States v. Ekelman & Associates, Inc.*, 532 F.2d 545, 551–552 (6th Cir.1976) (false applications for Veteran's Administration guaranteed loans and FHA insured loan); *United States v. Klein*, 230 F.Supp. 426, 441–442 (W.D.Pa.1964), aff'd 356 F.2d 983 (3rd Cir. 1966) (Veteran's Administration loan guarantees); *United States v. Stillwater Community Bank*, 645 F.Supp. 18, 19 (W.D.Okla.1986) (FmHA loan guarantees).

Nothing in *United States v. Neifert–White Co., supra*, can be said to contradict this result. See *United States v. Ekelman & Associates, Inc.*, 532 F.2d at 551. In *Neifert–White* the government sought to proceed under the False Claims Act against a grain storage bin dealer who had falsified

---

**6.** In his dissent, Justice Douglas thought the false application was an actionable effort to cheat the United States, even though any payment by the government would be contingent upon a default.

> The obtaining of credit risk insurance from the Government by fraudulent means is a form of plundering as flagrant as the presentation for "payment or approval" of any other type of claim against the Treasury.

*Id.* 356 U.S. at 602–603, 78 S.Ct. at 954.

**7.** Unlike defendant Bank, I can find nothing in *McNinch* to support the inference that the reservation of this question should be interpreted as a negative holding.

**8.** Until the 1986 amendments the Act contained no definition of "claim." Even if it were applicable in this case, I cannot say that the amendment sheds any additional light on the question.

> **(c) Claim defined.**—For purposes of this section, "claim" includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. 31 USC § 3719(c).

invoices which were submitted to the Commodity Credit Corporation so that government loans in excess of the amount permitted by law could be obtained by third persons. The loans themselves were not in default, and the trial court dismissed the complaint, holding that an application for a government loan, unlike a claim for payment of an obligation owed by the government, was not a "claim" under the meaning of the False Claims Act. There, as here, the defendant urged that the term "claim" should be given a narrow definition, and relied upon *McNinch* for that proposition. The Supreme Court expressly rejected that construction (*United States v. Neifert–White Co.*, 390 U.S. at 232, 233, 88 S.Ct. at 961, 962) and reiterated the distinction made in *McNinch* between situations in which the government had neither disbursed funds or suffered an immediate financial detriment and those situations in which the United States had actually paid or loaned money. *United States v. Neifert–White Co.*, 390 U.S. at 232, 88 S.Ct. at 961.

In the case before the court, the complaint alleges the submission, on May 27, 1980, by the corporate defendants, of false application documents for loan guarantees prepared and signed by the individual defendants. (Compl. ¶¶ 13–15, 39–40); the issuance of the guarantees by the FmHA on August 12, 1980 (Compl. ¶ 23); the borrower's default on the loans and the demand upon FmHA for performance on its guarantees (Compl. ¶¶ 31–32); and FmHA's repurchase of the guaranteed portions of the loans on November 3, 1981. (Compl. ¶ 33) Thus, it is clear that the government has suffered an immediate financial detriment as discussed in the above cases. While it

does not appear that this issue has ever been considered by our Court of Appeals, I am satisfied that the construction placed upon the Act by the Third and Sixth Circuits in *Veneziale, Klein* and *Ekelman & Associates, Inc.* is the correct one, and I adopt the views expressed therein. See also *Richards v. Local 134, Intern. Broth. of Elec. & Wrks.*, 790 F.2d 633, 636 (7th Cir.1986) (decisions of other circuits, while not controlling, are to be given substantial weight).

Applying those authorities, there can be no doubt but that the allegations of Counts I and II state actionable claims against the defendants under the False Claims Act, since the United States has been called upon to, and did, disburse funds on its guarantees. Nothing more is required. Accordingly, it will be recommended that the Bank's motion to dismiss be denied in this respect.

## II. *The Statute of Limitations Claim*

■ The foregoing discussion largely disposes of the second ground for dismissal advanced by defendants Bank and Ofsdahl and also by defendant Helstad; that is, that the claims under the False Claims Act (Counts I and II) are barred by the six-year statute of limitations contained in the Act.[9] Defendants urge that the violation of the Act, the event which triggers the running of the limitations, must be the filing of the false application with the FmHA. Since, according to the complaint, that act occurred on or about May 27, 1980 (Compl. ¶ 13), the filing of the complaint on July 27, 1987, defendants reason, was facially untimely.

■ That this contention must fail is apparent from the holding in *McNinch* that

---

9. Prior to the 1986 amendments to the Act, the limitations provision read as follows:

   A civil action under Section 3730 of this title must be brought within six years from the date the violation is committed.

(31 U.S.C. § 3731(b)). The 1986 amendments did introduce changes in the limitations provisions. However, for the reasons set forth *infra* pp. 553–554, I have concluded that those amendments may not be given retroactive effect. In any event, the amendments to the limitations provisions were immaterial. A three-year discovery provision was added (see § 3731(b)(2)) but the government acknowledges that it has no application here (Govt. Br. p. 4, n. 1 (Dkt. # 24)). Defendant Helstad urges that the three-year discovery rule should be applied and that it bars the government's claim. Defendant has misread the amended statute which specifically provides that the three-year discovery period serves only to extend, not to reduce, the six-year limitations period. See 31 U.S.C. § 3731(b) ("whichever occurs last").

the mere submission to the United States of a false application for a loan guarantee is *not* an actionable "claim against the government" under the Act. Since no violation of the Act occurred when the false application was filed, the statute of limitations obviously did not begin to run on that date.[10]

*Smith v. United States*, 287 F.2d 299 (5th Cir.1961), upon which defendants rely as creating a split of authority, does not advance their cause. *Smith* is not a loan insurance or loan guarantee case. Rather, as in *Neifert–White*, the false statement (a written request for credit or reimbursement) was made "with the purpose and effect of inducing the government immediately to part with money." *United States v. Neifert–White Co.*, 390 U.S. at 232, 88 S.Ct. at 961; *Smith v. United States*, 287 F.2d at 304.[11]

With but a single exception, it appears that the cases which have considered the limitations issue in the context of false applications for loan guarantees or insurance have all adopted the view that the statute does not begin to run until, at least, a demand has been made upon the government for performance on the insurance or guarantee. See *United States v. Ekelman & Associates, Inc.*, 532 F.2d at 552 (6th Cir.1976) and *United States v. Stillwater Community Bank*, 645 F.Supp. at 19 (W.D.Okla.1986) and cases cited. In *United States v. Klein*, 230 F.Supp. at 441 (W.D.Pa.1964) aff'd 356 F.2d 983 (3rd Cir. 1966), the court held that the period of limitations did not begin to run until the actual payment by the government on the guarantee or insurance. Again, the Seventh Circuit has not considered this question and I defer to the decisions of the Third and Sixth Circuits which I also believe to be correct applications of the law. See *Richards v. Local 134, Inter. Broth. of Elec. Wkrs.*, 790 F.2d at 637.[12]

The government's complaint was filed July 24, 1987. Accepting as true the allegations of the complaint, the holder of the mortgage, the Western–Southern Life Insurance Company, made demand upon the FmHA to perform on its guarantee sometime after September 9, 1981, and the agency actually made payment on November 3, 1981. Thus it appears from the face of the complaint that the triggering act necessarily occurred after July 24, 1981, and within six years of the filing of the complaint. Accordingly, it will be recommended that the motions to dismiss on statute of limitations grounds also be denied.

### III. *Effect of 1986 Amendments to False Claims Act*

■ Defendants Bank and Ofsdahl also contend that post-offense amendments to the False Claims Act should not be applied to them retroactively. Amendments to 31 U.S.C. § 3729 in 1986 increased the potential liability under the False Claims Act from a $2,000 civil penalty and twice the government's sustained damage to a civil penalty of not less than $5,000 nor more than $10,000 and treble damages. The amendments also added a new section 31 U.S.C. § 3729(b) which added a definition of "knowing" and "knowingly" in order to

---

**10.** Defendants' argument would have merit had Justice Douglas' dissenting view prevailed in *McNinch*. See n. 6, *supra*.

**11.** Thus, in *Smith* the false claim was actionable immediately upon its filing and it was therefore appropriate to measure the limitations from the date of the actual submission of the false claim. However, as discussed above, that cannot be the rule in cases in which the false claim was embodied in the application for loan insurance or guarantee. Indeed, it is clear that claims under the Act can arise in a variety of ways, and that no single rule can be applied to determine when the limitations period begins. This requires a determination in each case as to when a particular violation occurred for limitations purposes.

Defendants' arguments ignore this important distinction.

**12.** The facts of this case make it unnecessary to choose between the date of demand and the date of actual payment as the triggering date for the running of the statute of limitations. One district court decision has held that the default on the loan was the triggering act. *United States v. Goldberg*, 256 F.Supp. 540 (D.Mass. 1966). In light of the decisions from the Third and Sixth Circuits, I decline to follow *Goldberg*. Moreover, as the court noted in *Stillwater Community Bank*, 645 F.Supp. at 19, n. 1, the court in *Goldberg* was not actually confronted with the default/demand issue.

clarify the state of mind required for liability under the Act.[13] Because the amendments affect defendants' substantive rights and Congress did not clearly mandate retroactive application, the amendments may not be applied retroactively.

The government argues that statutory changes are presumptively retroactive under *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). In *Bradley* the Supreme Court held that a statute providing for attorney fees to prevailing plaintiffs in school desegregation cases should be applied retroactively to fee requests pending when the statute became effective. In so holding, the court relied

> on the principle that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is a statutory direction or legislative history to the contrary.

*Bradley,* 416 U.S. at 711, 94 S.Ct. at 2016. The existence of manifest injustice is determined by an inquiry into:

> (a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature and impact of the change in law upon those rights.

*Bradley,* 416 U.S. at 717, 94 S.Ct. at 2019. Part (a) of the *Bradley* inquiry focuses on the disparity in the parties' ability to protect their interests and the public's interest as represented by the parties. *Bradley,* 416 U.S. at 718–19, 94 S.Ct. at 2019–20. Part (b) centers on whether retroactive application of new law

> ... would infringe upon or deprive a person of a right that had matured or become unconditional.

*Bradley,* 416 U.S. at 720, 94 S.Ct. at 2020. Part (c):

> stems from the possibility that new and unanticipated obligations may be im-

posed upon a party without notice or an opportunity to be heard.

*Bradley,* 416 U.S. at 720, 94 S.Ct. at 2021.

The statute interpreted in *Bradley,* 416 U.S. at 721, 94 S.Ct. at 2021, was found not to change the "substantive obligation of the parties." Rather, the legislation was seen as merely an additional basis for the defendant's potential obligation to pay attorneys' fees, and did not create a new or unforeseeable obligation. *Bradley,* 416 U.S. at 721, 94 S.Ct. at 2021.

■ The government construes *Bradley* too broadly. Retroactive applications of statutes are not always appropriate. Indeed, "statutes affecting substantive rights and liabilities are presumed to have only prospective effect," *Bennett v. New Jersey,* 470 U.S. 632, 639, 105 S.Ct. 1555, 1560, 84 L.Ed.2d 572 (1985), absent "clear statements by Congress to the contrary." *United States v. Kairys,* 782 F.2d 1374, 1381 (7th Cir.1986), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986). In essence, to give retroactive effect to a statute or amendment affecting substantive rights and liabilities is manifestly unjust in the absence of a clear Congressional intent to the contrary.

The key inquiry here is whether the amendments to the False Claim Act are substantive or merely remedial.

> In order for a statute to be considered remedial it must be one that neither enlarges nor impairs substantive rights but relates to the means and procedures for enforcement of those rights.

*United States v. Kairys,* 782 F.2d 1374, 1381 (7th Cir.1986). The government relies on *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 549–51, 63 S.Ct. 379, 386–87, 87 L.Ed. 443 (1943) for the proposition that the damage provisions of the False Claims Act are compensatory and thereby the "amendments are only remedial in nature." To be sure, the statute has been considered to be non-punitive when viewed in conjunction with a criminal conviction for fraud

---

**13.** Under the amendment "knowing" or "knowingly" means that a person must have actual knowledge of information or act in deliberate ignorance or reckless disregard of the truth or falsity of supplied information. The amendment explicitly eliminates any requirement of a specific intent to defraud.

arising from the same act in construing the application of the Fifth Amendment's double jeopardy clause. 317 U.S. at 549–51, 63 S.Ct. at 386–87. See also *United States v. Hughes*, 585 F.2d 284, 287–8 (7th Cir.1978). However, this holding cannot be read to imply that the statute and its amendments do not enlarge or impair substantive rights.

In my view, the 1986 amendments to the False Claims Act are obviously of a substantive nature. The changes are plainly not limited to compensatory matters. The amendments greatly expand the potential penal liability of defendants in actions brought under the False Claims Act. The mandatory civil penalty has been increased at least fivefold. Defendants now face a minimum penalty of up to $5000 and possibly as much as $10,000. Defendants are further exposed to liability for three times the government's actual damages rather than the double damages under the old statute. This too has a significant penal aspect. While it is true that the terms "substantive" and "remedial" are quite general and open to a range of constructions, it is close to frivolous to suggest that the substantive rights of defendants were not affected by these amendments. These changes are not merely remedial, and the 1986 amendments cannot, therefore, be applied against these defendants, unless Congress has clearly indicated otherwise.[14]

■ The amendment's impairment of substantive rights creates a presumption of non-retroactive application which may be rebutted by a showing that Congress clearly intended the statute to be applied retroactively. *Kairys*, 782 F.2d at 1381. The presumption has not been rebutted here. Congress did not express such an intention. The statute is silent as to retroactive application. Neither does the legislative history reveal any intention that the amendments be applied retroactively. See 1986 U.S.Code Cong. and Admin.News 5266–5303.[15]

---

**14.** It has not been contended that the 1986 amendments are divisible so that some may be given retroactive application and others not. Thus, while the wisdom of such a rule, or its practicality, would seem suspect, I do not deem it necessary to address the question. My conclusion, therefore, extends to the entirety of the 1986 amendments. I would note, however, that while it is unnecessary to the decision, it would appear that the new definition of "knowing" may also expose persons to liability who were not similarly exposed under the prior statute. According to the Senate Report on the amendment:

> While it is clear that actual knowledge of a claim's falsity will confer liability, courts have split on defining what type of "constructive knowledge", if any, is rightfully culpable.

1986 U.S.Code Cong. & Admin.News 5266, 5285. The Seventh Circuit may have implicitly required actual knowledge of falsity to sustain liability under the old False Claims Act. The court stated that

> ... we believe a fair reading of the statute requires that it be construed to mean what it says. Anyone who "presents any claim upon or against the Government of the United States, knowing such claim to be false ..." is liable under the Act.

*United States v. Hughes*, 585 F.2d 284, 287 (7th Cir.1978). Although *Hughes* held that no specific intent to defraud the government was necessary to prove a cause of action, the court made no specific holding on the issue of constructive knowledge. 585 F.2d at 287–8. The amended statute does. It makes those in "deliberate ignorance" or "reckless disregard" of the truth or falsity of their claim equally liable under the False Claims Act. 31 U.S.C. § 3729(b) The amendment can thus be read as affecting substantive rights by altering a critical element of the offense and creating liability where it did not previously exist.

**15.** Congress' disinclination to give retroactive effect to changes in penalties have been expressed in a somewhat different context in 1 U.S.C. § 109:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture or liability....

This statute applies to amendments as well as repeals of statutes. *United States v. Mechem*, 509 F.2d 1193, 1194 (10th Cir.1975), and has been interpreted as protecting rights accrued under defunct statutes. See *e.g., United States v. Obermeier*, 186 F.2d 243, 253 (2d Cir.1950), *cert. denied*, 340 U.S. 951, 71 S.Ct. 569, 95 L.Ed. 685 (1951); *Barthelmy v. J. Ray McDermott & Co., Inc.*, 537 F.2d 168, 172 (5th Cir.1976). The statute has been applied to civil, as well as criminal, liability. *Hertz v. Woodman*, 218 U.S. 205, 217–18, 30 S.Ct. 621, 624–25, 54 L.Ed. 1001 (1910) (interpreting a predecessor to 1 U.S.C. § 109). While the amendments to the False Claims Act

Accordingly, it will be recommended that the court apply the Act as it existed prior to the 1986 amendments in its consideration of the case. However, since this issue addressed only the question of the law to be applied, and since movants have not shown that the complaint fails to state a claim for relief under the law in force and the time of offense alleged, it will be recommended that the motion to dismiss be denied as to this issue.

## IV. *Helstad Summary Judgment Claim*

■ Defendant Helstad also challenges the sufficiency of plaintiff's claims in Counts I–III of the complaint on the ground that he was innocent of any knowledge of any false statements contained in the loan application or supporting documents. This contention is not based upon any claimed inadequacies of the complaint (which plainly satisfies the test of *Conley v. Gibson*, 355 U.S. 41, 47–48, 78 S.Ct. 99, 102–03, 2 L.Ed.2d 80 (1957)) but rather upon Helstad's own, somewhat conclusory, affidavit.[16] Given the early stages of this case and the fact that little, if any, discovery has been performed, there is much to be said for excluding the extrinsic matter which Helstad has submitted with his Rule 12(b)(6) motion and refusing to consider the motion as one for summary judgment under Rule 56. See 6 Moore's Federal Practice ¶ 56.15[6] (the issue is one addressed to the discretion of the court). Indeed, in its brief the government asked, in the alternative, for an opportunity to conduct discovery as permitted by Rule 56(f)

(Gov't Br. p. 10 (Dkt. # 25)), but it failed to submit the supporting affidavit required by the rule.[17] However, I will consider the motion under Rule 56 because I find that a genuine issue of material fact does exist on the question of Helstad's knowledge of certain of the false statements charged, and no useful purpose would be served in postponing the consideration of the question.

In considering the motion for summary judgment I am guided by the familiar rule that judgment may be granted only if the record, including pleadings, depositions, answer to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56. Of particular significance in this case is the further requirement that all factual inferences are to be taken against the moving party and in favor of the opposing party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Powers v. Dole*, 782 F.2d 689, 694 (7th Cir.1986). If any doubt exists, it must be resolved against the movant. *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336, 1339 (7th Cir.1985).

The heart of defendant Helstad's affidavit and his argument lies in the claims:

(1) That he prepared the (unaudited) balance sheet and income statement contained in the FmHA application solely from information in the financial records of defendant Ettrick Wood Products, Inc. as provid-

---

did not "release or extinguish" penalties or liabilities, the Congressional policy (of preserving the *status quo* absent express provision to the contrary) underlying Section 109 is clearly reflected in the holdings in *Bennett,* 470 U.S. at 641, 105 S.Ct. at 1561, and *Kairys,* 782 F.2d at 1381.

16. Helstad does not contest (nor does he admit) that false information was actually submitted to FmHA, but rather enters a general disclaimer of knowledge of any false information. His submission does not include any of the application documents (including those he admits having prepared) nor does he disclose the actual information he claims to have been furnished and relied upon, or identify the source of that information.

17. Both parties have also taken some liberties with the argument of facts not supported in the record by affidavits, depositions, or the like as required by Rule 56(e). I have simply disregarded these unsupported assertions of fact for the reasons set forth with some force in the recent decision of the Court of Appeals in *Friedel v. City of Madison,* 832 F.2d 965, 969–971 (7th Cir.1987) (*e.g.,* the government's claim of a familial relationship between Helstad and the McLeods and the unauthenticated demand letter from the holder of the mortgages attached to the government's brief (Dkt. # 25) as Exhibit 1.) As to the discussion in *Friedel,* it should be noted that it does not appear that the Court's Procedures on Motions For Summary Judgment discussed therein has yet been provided to the parties in this case.

ed to him by defendant Ofsdahl and defendant Stephen McLeod (Aff. pp. 2–3, 5–6).[18]

(2) That the financial statements prepared by Helstad and his firm and furnished to the FmHA contained a disclaimer that the statements had not been audited and that no opinion was being expressed with respect to them.[19]

(3) That Helstad had no knowledge of any false information in the application and supporting documents.

All of the information relating to the operations of corporate defendants and their principals, including, but not limited to Messrs. Ofsdahl and McLeod, were supplied to me by them; I had no independent knowledge of any facts to the contrary, or any reason to dispute the presentations as made to me by them. If there was any intent to defraud the government agencies or banks I had no knowledge of that and no reason to suspect any such misrepresentations, if indeed there were any.

Helstad Aff. p. 6.

One of the false statements alleged in the complaint pertains to the understatement of the indebtedness of Ettrick to the Bank (Compl. ¶ 39(A)), and another pertains to the related subject of the intended application of the loan proceeds and their use to pay off Ettrick's loans from the Bank. (Compl. ¶¶ 18, 26–27, 39(D)).[20]

On May 22, 1985, the grand jury returned a nine-count indictment in *United States of America v. Ronald O. Helstad, Robert J. Ofsdahl, Stephen K. McLeod and Ettrick States Bank*, No. 85–CR–24–C, charging crimes in connection with the FmHA loan guarantee which is the subject of the instant lawsuit. Defendant Helstad was charged with two counts of conspiracy to submit false statements, one count of concealment of a material fact (a false note from Ronald O. Helstad to the Ettrick State Bank dated June 2, 1980, in the amount of $75,000) and one count of conspiracy to conceal a material fact, all in violation of 18 U.S.C. §§ 371, 1001, and 1005.[21] On September 13, 1985, as a part of a plea bargain, defendant Helstad appeared with counsel before the Honorable Barbara B. Crabb and entered a plea of guilty to a one-count information charging him with the alteration, on or about February 1, 1983, of the work papers of his firm's 1980 audit of Ettrick by deleting the reference to himself as the obligor on a fictitious note and substituting the name of Scott Helstad, all in violation of 18 U.S.C. §§ 3 and 1005. (See Transcripts of Plea Hearing, pp. 4–6).[22]

---

**18.** For purposes of the motion only, I accept Helstad's assertion that everything else in the application and supporting documents was put together by someone else outside his firm (the earnings projection by Mr. Engleson excepted). (Aff. pp. 3–5) I must observe, however, that in ordinary circumstances it would have been virtually impossible to address the issue of knowing false statements without having in the record the documents themselves with the authorship and allegedly false portions clearly identified. The burden is on the moving party to assure that the record is sufficiently complete to permit the informed consideration of the motion.

**19.** The disclaimer reads:

The accompanying balance sheet of Ettrick Wood Products, Inc., as of January 31, 1980, and the related statement of income for the four months ended have been compiled by us. A compilation is limited to presenting, in the form of financial statements, information that is the representation of management. We have not audited or reviewed the accompanying financial statements and accordingly do not express any opinion or any other form of assurance on them.

Helstad Aff. p. 2. Though the government has not objected, this evidence is technically inadmissible under the original document rule (FRE 1002) and is also inadmissible hearsay to the extent it is offered to prove asserted facts. FRE 801(c). Nevertheless, I will consider the evidence for what it is worth.

**20.** According to the Complaint, $416,000 was actually used to refinance debts to the Bank, whereas the certified schedule said only $252,000 was to be used for that purpose. (Compl. ¶¶ 18, 27)

**21.** A copy of the indictment is attached as Exhibit 2 to the Government's Brief (Dkt. # 25).

**22.** A copy of the transcript of the proceedings is attached to the government's brief (Dkt. # 25) as Exhibit 4. A court may, of course, take judicial notice of its own records and proceedings. FRE 201, McCormick on Evidence, § 330.

In the course of that proceeding the Assistant United States Attorney (Mr. Humphrey) made a proffer of the evidence that it would have introduced had the case gone to trial. Mr. Humphrey stated that Mr. Ofsdahl, the president of the Bank, would have testified that on June 2, 1980, he made a false note to the Bank in Helstad's name in the amount of $75,000; that no such monies had actually been loaned to Helstad and the proceeds of the note were applied to conceal the fact that the Bank had exceeded its lending limit to Ettrick. Thus, the false note would make it appear that Helstad rather than Ettrick owed the $75,000. Ofsdahl would have testified that the false note was made to deceive a Wisconsin bank examiner. According to Mr. Humphrey, Ofsdahl would further have testified that in early 1983 Ofsdahl told Helstad that the FmHA wanted to audit certain bank records regarding Ettrick, "And this would have included their looking at the $75,000." Ofsdahl subsequently removed the note bearing Helstad's name from the Bank records and replaced it with a note bearing the name Scott Helstad and he informed Helstad of what he had done. (Tr. of Plea Hearing: pp. 11–12)

Humphrey then stated the government would show that Helstad obtained the work papers prepared by Helstad's accounting firm in connection with an audit of the FmHA loan to Ettrick conducted at the end of 1980, and that Helstad altered the work papers to substitute the name of Scott Helstad as the maker of the note in place of his own name. (Tr. of Plea Hearing: pp. 12–13) Earl Engelson, a CPA employed in Helstad's accounting firm, would have testified that he assisted Helstad in the audit of Ettrick at the end of 1980 and that he (Engelson) had made entries in the work papers regarding the disposition of the loan proceeds by including an entry regarding the Ron Helstad note for $75,000; that someone subsequently altered the work papers by substituting the name of Scott Helstad for Ron Helstad, and defendant Helstad subsequently admitted that he had made the alteration. (Tr. of Plea Hearing: p. 13)

According to Mr. Humphrey, Agent Southworth of the FBI testified that defendant had given a statement admitting that in approximately February, 1983, Ofsdahl had told him (Helstad) that an auditor from FmHA was coming to the Bank regarding Ettrick; that Ofsdahl told Helstad "that something had to be done about the $75,000 note in Helstad's name, since it had been paid out with [FmHA] loan proceeds." Helstad also told Southworth that Ofsdahl changed the Bank's records to reflect the name of Scott Helstad instead of Ron Helstad's, and that defendant Helstad himself went to the accounting firm's work papers, which Engelson had prepared, and changed the name Ron Helstad to Scott Helstad in connection with the $75,000 note. (Tr. of Plea Hearing: pp. 13–14)

At the conclusion of Mr. Humphrey's recitation, the following exchange took place at the plea hearing:

The Court: Mr. Coffey, from what you know about this case, is there anything that you would dispute in Mr. Humphrey's recital?

Mr. Coffey: No, your Honor.

The Court: Mr. Helstad, anything that you would dispute?

The defendant: No, your Honor.

(Tr.: 14)

The foregoing account by Mr. Humphrey is admissible in evidence against Mr. Helstad as an adoptive admission. FRE 801(d)(2)(B). Helstad's own affidavit acknowledges that he personally participated in the preparation of three sets of financial statements for Ettrick—one in late 1979 in connection with an SBA loan application, one in February, 1980, for the period ending January 31, 1980, and one for the period ending March 31, 1980, which was incorporated into the FmHA loan application filed May 27, 1980. (Aff. pp. 2–4; Compl. ¶ 13) As noted, the fictitious $75,000 note designed to conceal Ettrick's liability to the Bank was prepared just six days later, and that fictitious note was recorded as having been discharged out of the FmHA loan proceeds. The note clearly misrepresented the indebtedness of Ettrick to the Bank, as charged in the complaint (¶ 39(A)), and to

the extent that loan proceeds were applied to discharge the concealed obligation, the same was false and fraudulent as alleged in ¶ 39(D) of the complaint. In 1983, when the FmHA wanted to audit the Bank's records, Ofsdahl told Helstad and Helstad proceeded to alter his own firm's audit work papers so as to delete the reference to himself with regard to the loan.

It is understatement, I think, to say that a jury could infer that Helstad had knowledge of the falsity of at least this aspect of the loan application documents. Helstad's argument that he simply accepted the financial records as provided him by Ettrick and the Bank is particularly unconvincing in light of the evidence that his own name was on a note to the Bank which actually represented an obligation of Ettrick to the Bank. Helstad has not filed a counter-affidavit to deny that he was unaware of the existence of the note or that it represented a concealed obligation of Ettrick to the Bank at the time the loan application was under consideration. Even had he filed such an affidavit, it would not have altered the existence of the inference of his knowledge as reflected in the evidence.

In his reply brief, Helstad relies again on the disclaimer submitted by his firm with the Ettrick financial statements. This disclaimer is clearly of no evidentiary value on the question of whether or not Helstad knew of the falsity of the financial statements.[23] It is common knowledge that such statements are routinely appended to unaudited financial statements so that a reader will not be misled to believe that the accounting firm had validated the numbers. However, defendant has not offered any authority, nor am I aware of any, for the proposition that the disclaimer excuses the conscious presentation of financial information known to be false.[24]

Helstad also argues (Reply Br. p. 4 (Dkt. # 29)) that he did not learn of the false note until early 1983. As noted above, the record does not support that conclusion. Nor is it of particular significance, as argued, that it was Engleson who made the original work paper entries. Helstad was apparently the senior accountant on the Ettrick account, and could have been expected to be acquainted with the work—particularly when it appeared to affect his own financial obligation in connection with a matter in which he was serving in a professional capacity.[25] In short, the record shows that Helstad's name was not only on a false note designed to conceal an Ettrick liability, it was also so recorded in his own firm's audit work papers in an account over which he had supervisory power. When the threat of an audit surfaced in 1983, Helstad knew the record was in the work papers, knew where to find it, knew it was false, and altered the papers in order further to conceal the misconduct. Helstad's claim that no genuine issue of fact exists on the issue of his knowledge of the falsity of the application must fail.

For the foregoing reasons it will be recommended that the Helstad's motion for summary judgment be denied.

## RECOMMENDATION

IT IS RESPECTFULLY RECOMMENDED, pursuant to 28 U.S.C. § 636(b)(1)(B), that each of the motions of the defendants be DENIED.

---

**23.** Presumably the financial statements submitted with the application falsely understated Ettrick's liabilities to the Bank by $75,000.

**24.** Nor is it of any consequence on this motion that defendant Helstad had no financial interest in either Ettrick or the Bank or that he realized no financial gain from the transaction in question, as his affidavit asserts. The only issue is whether he *knowingly* furnished false information to the FmHA.

**25.** Mr. Helstad assured the FmHA representative at the outset that he, Helstad, had no financial interest in either Ettrick or the Bank. (Aff. p. 3) Presumably such an interest would have an effect on his independence as an accountant.